**Donald Joseph LaREAU, Petitioner,**

v.

**Ellis C. MacDOUGALL, Commissioner of Corrections for the State of Connecticut, and Frederick E. Adams, Warden, Connecticut State Prison, Respondents.**

**Civ. A. No. 14035.**

United States District Court,
D. Connecticut.

May 20, 1971.

Hubert Santos, Enfield, Conn., for petitioner.

Stephen J. O'Neill, Asst. Atty. Gen., State of Connecticut, Robert Killian, Atty. Gen., Hartford, Conn., for respondents.

CLARIE, District Judge.

This civil rights complaint was filed September 23, 1970, pursuant to 42 U.S. C. § 1983 and alleged jurisdiction under 28 U.S.C. §§ 1343(3) and 1651. The prepayment of fees and costs were waived and the Court appointed an attorney to represent the petitioner, as provided in 28 U.S.C. § 1915. Counsel then filed a substituted complaint in four counts, setting forth the petitioner's claims for relief in greater detail.

In the first count he alleges a violation of freedom of speech under the first amendment and complains of (a) administrative censorship or refusal to mail correspondence to the petitioner's family and friends; (b) censorship or refusal to mail correspondence to his attorneys; and (c) censorship or refusal to send mail to a state court. The second count alleges a constitutional denial of freedom of religion claiming that he has been denied the opportunity to practice his religion, because he was denied permission to attend mass in the prison chapel, receive the sacraments or participate in any ceremony prescribed by his religion. The third count alleges cruel and unusual punishment, because he was placed in a stripped cell without adequate sanitary and living facilities and for inadequate reasons. The fourth count alleges a violation of procedural due process, because on certain occasions punishment had been imposed without affording him the opportunity of appearing before the prison disciplinary board; and on those occasions when a hearing was allowed, minimal due process procedures were not afforded him.

The petitioner's prayer for relief requests that this Court enjoin the defendants from (1) reading, censoring or refusing to mail correspondence to any member of his family, his friends, attorneys or the courts; (2) disciplining him for anything written to a court or anything of a legal nature written to his attorney or to his family or to a prison administrator; (3) placing him in solitary confinement and thereby depriving him of good time without complying with minimal due process requirements; (4) disciplining him because of statements in letters to persons outside the prison, unless those statements present a clear and present danger of disrupting the security of the institution or some justifiable purpose of imprisonment; and (5) denying him the right to practice his religion while in solitary confinement. The petitioner also requests that this Court order the restitution to him of all good time lost, while he was confined in solitary; also all such time as he lost, because of letters which he attempted to send to his family, friends, prison officials, his attorney or the prison administration board; and a further demand that he be granted a judgment for substantial monetary damages.

The petitioner's prison record, insofar as it relates to his present incarceration, discloses that he was convicted on February 2, 1966, on a charge of indecent assault and sentenced to the State Prison for a term of not less than two nor more than six years. On January 10, 1969, he was paroled from this sentence, but was returned as a parole violator on July 25, 1969, having been arrested on July 10, 1969, on a charge of forgery (Tr. 46). He was presented in court on May 13, 1970, and pleaded guilty on only two of the counts (four and ten) of the ten-count information.[1] Count four

---

1. See Return of Respondent, Paragraph 6(a) and attached Exhibit.

charged an escape from the Hartford Correctional Center on November 16, 1969, and count ten charged an escape from custody on August 25, 1969, at the Manchester, Connecticut Police Station while temporarily confined, awaiting a preliminary hearing in the state court. On May 29, 1970, the petitioner was sentenced to serve not less than five nor more than ten years in the state prison on the fourth count, and one year on the tenth count, a total effective sentence of not less than five nor more than eleven years; this sentence was to run concurrently with any time then remaining to be served on the prior conviction of February 2, 1966. He completed serving the latter sentence as of December 22, 1970. (Tr. 364).

### JURISDICTION

The petitioner claims jurisdiction in this Court pursuant to 42 U.S.C. § 1983 and 28 U.S.C.A. § 1343. The defendants argue, however, that several of his claims were litigated in prior habeas corpus petitions in the State Superior Court, after a full hearing, and were adversely ruled upon. They claim that under such circumstances, this Court should apply the doctrine of collateral estoppel and res judicata to those issues previously decided by a final state court judgment.

These state habeas corpus proceedings were custodial in character and were limited in scope to the validity of time credits used to compute the petitioner's term of incarceration. *See* Saia v. Warden, 25 Conn.Sup. 519, 209 A.2d 520 (1964); United States v. Bibb, 249 F.2d 839 (7th Cir. 1957). The allegations here; on the other hand, are concerned primarily with administrative violations, which if true, could constitute a deprivation of federal constitutional rights, which are of concern to the court. Not only is the plaintiff seeking equitable relief, but also monetary damages. The United States Supreme Court in McNeese v. Board of Education, 373 U.S.

668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963), clearly set out the jurisdictional guide lines in such matters when it said:

"  .  .  . (P)etitioners assert that respondents have been and are depriving them of rights protected by the Fourteenth Amendment. It is immaterial whether respondents' conduct is legal or illegal as a matter of state law. Monroe v. Pape, *supra* 365 U.S. [167] at 171–187, [81 S.Ct. 473, at 481, 5 L.Ed.2d 492]. Such claims are entitled to be adjudicated in the federal courts."

*Also see* Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967), and Sostre v. McGinnes, (2 Cir.) 334 F.2d 906, cert. denied 379 U.S. 892, 85 S.Ct. 168, 13 L.E.2d 96 (1964).

■■ The Court finds federal jurisdiction to be applicable to all of the human rights issues raised by the petitioner in this action, without this Court's being conclusively bound by the state court's findings in the prior habeas corpus hearings on factually similar issues. The petitioner's prior state habeas corpus petitions which were unfavorably acted upon do not constitute a statutory election precluding federal jurisdiction under 42 U.S.C. § 1983.

### *First Count*

The mail censorship issues and the prepayment of postage requirements have been substantially eliminated by the new mailing regulations adopted May 25, 1970,[2] subsequently amended effective February 18, 1971. Paragraph # 6 of said regulations permits unrestricted inmate correspondence with attorneys, the courts and multiple other public officials whose duties might relate, directly or indirectly, to the prisoner's incarceration; and Paragraph # 9 thereof prohibits censorship or delay in the handling of correspondence ad-

---

2. Defendants' Exhibit "B".

dressed to prisoner's legal counsel or the courts. (Tr. 290). Assurance of this free access to the courts is provided under Paragraph # 8, where it states that first class postage will be provided free by the state, where it is required for mail to be sent to judges or the courts; and all requests for a speedy trial under the Interstate Compact Agreement may now be sent by prepaid certified mail at state expense. (Tr. 267). This rule of free postage however, is applicable only where the inmate has less than five dollars balance in his commissary account. (Tr. 281). Regulation #. 3 permits unlimited personal correspondence at the inmate's expense with a maximum of seven approved outside correspondents on the inmate's mailing list. (Tr. 129). Those who have less than a five dollar credit balance in the commissary account are provided with two free sheets of postage paid stationery for personal correspondence. (Tr. 154). The foregoing rules are recognized by this Court as being consistent with reasonable standards of prison postal procedure.

> "The generous scope of discretion accorded prison authorities also heightens the importance of permitting free and uninhibited access by prisoners to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. The importance of these rights of access suggests the need for guidelines both generous and specific enough to afford protection against the reality or the chilling threat of administrative infringement."

> .    .    .    .    .    .

> "We need only add that when we say there may be cases which will present special circumstances that *would* justify deleting material from, withholding, or refusing to mail communications with courts, attorneys, and public officials, we necessarily rule that prison officials may open and read all outgoing and incoming correspondence to and from prisoners." Sostre v. McGinnis, 442 F.2d 178, at 200, 201 (2d Cir. 1971 in banc).

Since present prison mailing practices do conform with the foregoing standards established by the appellate courts, even if individual instances of violation were found to have occurred in the past, no grounds for equitable relief now exist.

> ".    .    . (I)t is elementary that a court of equity will not enjoin one from doing what he is not attempting and does not intend to do." New Standard Pub. Co. v. FTC, 194 F.2d 181, 183 (4th Cir. 1952); Negron v. Wallace, 436 F.2d 1139 at p. 1145 (2d Cir. 1971).

### Second Count

When LaReau arrived back in prison as a parole violator (Tr. 372), he was placed in temporary quarantine in the administrative segregation section from July 25, 1969 to August 14, 1969. When this period had elapsed, he was released into the general prison population. (Tr. 373). On August 22, 1969, he was transferred to the state jail and escaped from the Manchester Police Station on August 25, 1969, while temporarily detained awaiting arraignment in the 12th Circuit Court. He was apprehended and returned to the prison September 17, 1969, where he was placed in administrative segregation. On September 29th, he was temporarily taken to the state jail and returned October 1, 1969. He was transferred on Nobember 13, 1969 to the state jail and he escaped from custody again on Nobember 16, 1969. He was apprehended and returned to the prison on November 29, 1969, where he was assigned to administrative segregation. (Tr. 374).

There were four periods during his confinement in which the petitioner was administratively disciplined and punished after due hearing before the prison disciplinary committee. These incidents resulted in his being ordered to serve time in punitive segregation or maximum punitive (a strip cell). Prisoners who are not in general population are denied the right to attend chapel

services as well as many other privileges. LaReau complains that he, as a Roman Catholic, was denied the privilege of attending mass and that such a denial violates his constitutional rights of freedom of religion under the first amendment.

The prison chaplain, Father Shanley, testified that LaReau did attend mass regularly in the chapel, when he was in the general population (Tr. 403). The regular Sunday masses in the chapel are at 8:00 A.M. and 10:00 A.M. The chaplain explained that he customarily visited the segregation areas at any reasonable time upon request to hear confessions and administer the sacrament of holy communion. Adequate facilities were available to afford privacy and in his opinion the inmates' spiritual needs were adequately fulfilled. (Tr. 409). Contrary to LaReau's claims, that Father Shanley refused to come to the segregation area to administer the sacraments to him, the chaplain denied that he had ever refused to administer to LaReau's spiritual needs when called upon to do so. The Court accepts the testimony of Father Shanley as being credible.

The Commissioner of State Corrections explained that the major disciplinary problems of the institution are housed in the administrative block, which is comprised of approximately sixty cells. Many of the inmates detained there have serious disciplinary records and are the would-be leaders around whom other inmates rally their support. (Tr. 263). The Commissioner estimated that about 15% of the prison population have some kind of psychosis; 25% have some deep-seated emotional difficulty or character disorder; and 20% are hardened criminals, who are anxious to continually cause strife in the daily operation of the prison. It is for this reason that the prison regulations provide that only four inmates from the segregation area are allowed out of their cells at one time for recreation; otherwise, there would be a grave danger that they might take over the cell block. To move these men so that they might attend mass in the chapel would invite major disciplinary incidents. This rule has not been applied to LaReau in any discriminatory manner; it has been applied equally to all inmates. (Tr. 263–65).

■ There has been no unreasonable denial to this petitioner of his right to receive the sacraments of his religion or to otherwise practice his religious beliefs. The security of the prison is the paramount factor and the freedom of movement of those inmates requiring segregation is strictly regulated, because they are considered dangerous and unduly troublesome within the prison population. To permit LaReau to attend chapel while in segregation, would require that everyone else in the same status would have to be similarly treated. Such a rule would require an administrative decision founded on professional penal experience and common sense. The Court finds that the Commissioner's decision was not arbitrary or capricious, but necessary for good order and security within the institution. *See* Wright v. McMann, 387 F.2d 519, 526, n. 17 (2d Cir. 1967); Cleggett v. Pate, 229 F. Supp. 818, 819–821 (N.D.Ill.1964); *also see,* Cooper v. Pate, 378 U.S. 546, 84 S. Ct. 1733, 12 L.Ed.2d 1030 (1964).

### Third Count

The third count alleges that the petitioner was subject to cruel and unusual punishment by reason of his confinement in a stripped or barren cell, in violation of the eighth amendment to the United States Constitution. He represents that this confinement in a stripped cell was cruel per se and that the punishment meted out to him was disproportionate to the violations which he was found to have committed. Another phase of his claim was that his long confinement in administrative segregation without adequate exercise, also constituted cruel and inhuman punishment.

There are three general categories of segregation which deprive an inmate of

the general privileges, which are afforded to all those in the open prison population. The first grouping is administrative segregation; the second, punitive segregation; and the third is the stripped cell, now called maximum punitive segregation. The first category requires a continuous 24-hour cell confinement, except for one hour of recreation each day. Prisoners so confined are provided three full meals, a bed with mattress, a desk, writing utensils with writing supplies, toilet facilities, a lavatory and general toiletries. They are allowed the use of a radio, newspapers, magazines, and general commissary items, except that they are not free like those in the general prison population to go to the store to make their own purchases. They are also permitted to have reasonable visitation privileges to the prison law library.

Punitive segregation, on the other hand, is limited to not more than 30 days (Tr. 30, 308), and it is imposed only after a formal notice of charges and the holding of a hearing before the disciplinary committee. Those in punitive segregation are provided with three meals a day, but without dessert or condiments. They are furnished a mattress, but only between the hours of 3:00 P.M. and 8:00 A.M.; there are toilet and lavatory facilities; sheets and blankets are provided; radios and reading materials are not permitted, but a bible will be furnished if requested.

Maximum punitive segregation is limited to no more than eight days, except with the special approval of the Commissioner of Corrections or his deputy. The average period for this type of punitive incarceration is five days. This punishment is imposed only after a formal written notice, followed by a hearing before the disciplinary committee. Three meals per day are provided, but with no condiments, desserts or coffee with cream and sugar, (Tr. 316); a mattress is provided between 3:00 P.M. and 8:00 A.M., and a blanket is furnished when the room temperature so requires. The size of the cell is approximately 6' x 10' x 8'; it contains a regular commode with a sink; the inmates are permitted tooth paste and a toothbrush on request and they may have a bible.

Since the original construction of the prison, there has been specially constructed in addition to the regular maximum punitive cells, an additional series of stripped cells, so-called, that are barren of any commode or sink. These units are substantially the same as the maximum punitive cells (Tr. 321), except that they have what is called a Chinese toilet. These latter facilities are built into the floor by providing a hole with a grill (Tr. 371) in a corner of the cell. This toilet may be flushed by a manually controlled valve outside the cell. There is no built-in ledge in these units on which to sleep (Tr. 388); lighting is provided by a fixture located outside the cell, which shines through a glass in the rear cell wall. General prison policy requires that no dark cells should exist (Tr. 312), however, the Commissioner was unable to say with certainty, that any written policy existed, which directed guard personnel to provide lighting when requested by a cell occupant. Prison guard Waldo testified that the light in the strip cell was lighted during feeding time, thus inferring it was not otherwise lighted. (Tr. 215).

This stripped cell (maximum punitive) was the same size as the ordinary regulation cell, except that after one enters through the steel access door, there is a space or entryway of approximately two feet, before one reaches the exterior cell bars fronting on the cell. Each unit is completely separated and isolated from the adjoining cell units by walls of solid cement. When the exterior steel door is closed, the opening in the door may be covered by a metal plate, so that inmate noise and disturbance is eliminated. Such cells are primarily used to isolate an inmate who has made himself generally obnoxious in the maximum punitive area by yelling, screaming, and causing general annoyance. Such con-

duct, of course, cannot be permitted to go unchecked, because the noise is carried into other areas through the ventilation duct work and is likely to invite violent response from other inmates in the same cell block or even spread throughout the entire institution. These isolated stripped cells provide a complete solitary confinement area for those who become incorrigible. It also assures the existence of a facility where physical damage to fixtures or prison property cannot occur.

A regulation was promulgated by the Corrections Commissioner on March 2, 1970, which prescribed that inmates in punitive segregation must receive a daily minimum of 2300 calories of food per day. The prison officials misinterpreted this to mean, that if the minimum food service was provided in one meal, that would fulfill the rule requirements. This error was discovered by the administration and corrected by a directive in August 1970. Contrary to LaReau's testimony, the prison records do not indicate that he had served time in punitive segregation during this specific period between March 2, 1970 and August 1970, thus he could not claim to have been subjected to the misapplication of this regulation.

All inmates are encouraged to write to the Commissioner of Corrections, the Warden or his deputy, concerning any prison matter affecting them. This correspondence is sealed and uncensored and a special depository is provided for their transmittal. Such a letter of criticism was addressed to Assistant Warden Stout by the plaintiff,[3] but at the end of his message, he wrote a postscript which challenged and ridiculed prison discipline. It said, "Rules, Rules, Rules. The petty whims of petty men." (Prison discipline, 1825–1925), (Tr. 166).

On October 5, 1970, at 3:30 P.M., promptly after the receipt of this letter by the assistant warden, LaReau was given written notice of charges for in-

solence and disrespect and was advised that the matter would be heard by the board on October 6, 1970. After a full hearing, at which the petitioner personally appeared and was given the opportunity to explain his version of the alleged misconduct, the disciplinary board found him guilty of insolence and disrespect. It ordered that he be assigned to punitive segregation indefinitely. Such an indefinite sentence could not extend beyond eight days, (Tr. 253); it usually averaged about five days. The policy was that if the inmate straightened out and behaved, he would be released from this punitive segregation. In this instance he actually served seven days.

On January 6, 1970, the petitioner, a Caucasian, sent a letter to the Commissioner of Corrections, which was not only written in derisive terms, but also in Negro dialect. It said, "I is gotta idea, but because you is cruel and inhuman, I ain't gonna tell you. I want to go to da church dis Sunday . . . ya hear me boy." (Tr. 256). This letter was referred to the disciplinary committee with an order that LaReau be tried on a charge of insolence to the Commissioner. (Tr. 260). LaReau was given a hearing after notice and ordered to punitive segregation from January 30, 1970 until February 6, 1970 (Tr. 376). During this period, a further misconduct report was filed against him, to the effect that he was found in possession of contraband. These items were described as a rope fashioned from towels, a newspaper, a magazine, pencil, preen and instant coffee (Tr. 376). For this violation of regulations, he was confined to the stripped cell (maximum punitive) from February 6, 1970 to February 11, 1970 (Tr. 377).

Thereafter, he was returned to administrative segregation and remained there until July 23, 1970, when he was returned to general population. To have allowed him back into the general population immediately would have encouraged him to be an inmate leader and in-

---

3. Petitioner's Exhibit #20.

vite further disciplinary problems. (Tr. 263).

It is the petitioner's claim that the stripped cell and the conditions of confinement therein constituted cruel and unusual punishment per se. The Court personally viewed these cells on May 18, 1970, accompanied by counsel for both parties. The Court saw the physical facilities provided for the various categories of segregation as hereinbefore described. It finds that these cells, when properly used for limited periods according to the existing rules, do not constitute cruel and abusive punishment per se; and that their use did not become such in the manner in which punishment was administered in LaReau's case. In reaching this conclusion, this Court concurs in the findings of the state court.[4]

Petitioner's counsel claimed that the Court should not consider LaReau's incarceration in the maximum punitive unit (Tr. 44) without first having him psychiatrically examined to determine whether such solitary confinement might affect his mental health, (Tr. 336, 417), and that this absence of care constituted cruel and inhuman treatment. He did not make any claim, however, that the petitioner was in fact, mentally ill at any time. (Tr. 337). Rather it is his claim that the absence of specific rules which would provide medical and professional psychiatric safeguards in each case, such as the petitioner's, supports his challenge of cruel and inhuman treatment. (Tr. 339, 417).

The Commissioner was personally aware of LaReau's problems; he had received letters from him constantly, for LaReau was a compulsive letter writer.[5] He did not regard him as being psychiatrically ill, but he did consider him to be a behavior problem and to be emotionally ill. (Tr. 330). However, his condition was not such as would warrant his receiving the attention of a psychiatrist. (Tr. 350). Between July 23, 1970 and August 19, 1970, LaReau was tested in the diagnostic center, just prior to his being assigned into general population. Medical records disclose that he was visited weekly by the doctor at the prison (Tr. 415); and he was seen by the psychiatrist, Dr. Sheard, and by the psychologist O'Hare. (Tr. 421). The prison psychiatric department already had a very extensive file on LaReau, including several psychiatric evaluations. (Tr. 427, 434). Dr. Flaherty (M.D.) found LaReau to be "a fairly stable emotional individual." (Tr. 435). There was no credible evidence offered to support the petitioner's claims that he had been cruelly or inhumanly treated.

LaReau's final complaint is that minimal procedural due process was not afforded him by the disciplinary board before their imposition of disciplinary punishments. This board is ordinarily made up of four members, with a member of the medical department having the option to sit, if he so desires. (Tr. 167). It meets twice weekly (Tr. 170) and usually consists of a supervisory captain, a lieutenant, a correctional officer, and a correctional counselor. (Tr. 168). Its proceedings do not afford counsel for accused inmates and no transcript as such is kept, but the secretary does keep written notes in regard to the proceedings. All decisions of this board must be approved by the warden and are subject to final approval by the deputy commissioner. There are no written rules of conduct, nor are there any written guide lines for meting out punishment (Tr. 445), except as to limitations on maximum confinement (Tr. 309). The cases are viewed in the perspective of the inmate's overall conduct record and discipline is prescribed on the basis of common sense and experience.

When a complaint is received, a copy of the charge is delivered to the inmate

---

4. Memorandum of Decision, LaReau v. Adams, Docket Nos. 162759 and 163871 (Super. Ct. Hartford Cty., June 8, 1970), filed with this Court December 8, 1970.

5. *Supra*, note 4.

by a correctional officer and the time of service is noted on the return. While there is no specific period of time required for notice to be served prior to the hearing, it is usually served about 48 hours in advance. The hearing rules do not provide that the inmate has a right to call witnesses in his own behalf or to be represented by an attorney at the disciplinary hearing.

Such a hearing does provide an adequate opportunity to be heard by a panel, after due notice, under all the existing circumstances attendant upon effective prison administration, with a right to appeal any decision to the Warden. (Tr. 444). *See,* Goldberg v. Kelly, 397 U.S. 254, 268–269, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1969); Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970).

LaReau's final claim of cruel and unusual punishment by prison authorities was his incarceration in administrative segregation from November 28, 1969 until June 1970, without scheduling him for regular exercise periods.

Commissioner MacDougall decided that LaReau constituted a danger to the security of the jail type of correctional center and he transferred him to administrative segregation at the state prison. (Tr. 254). LaReau had not yet been tried or sentenced on the pending criminal charges and it had been the prison policy that when a defendant had additional charges pending against him, he should be held in administrative segregation; this was particularly true when he was the subject of disciplinary problems. LaReau had already escaped from custody twice (Tr. 253–4) and his personal attitude was still non-cooperative. He remained in administrative segregation, until the disposition of the outstanding charges, which were concluded by guilty pleas on May 13, 1970, for which he was sentenced May 29, 1970. According to the Commissioner, had his attitude been better, he could have been out of administrative segregation and back in general population much earlier.[6] (Tr. 259). An inmate in a segregation area of any type was not entitled to earn the five days' statutory meritorious good time each month, as he otherwise could have had he been in general population.

Sostre v. McGinnis, *supra,* established the benchmark governing segregated confinement in this Circuit. He had been in continuous segregation for more than one year. In that case, the court said:

"It is undisputed on this appeal that segregated confinement does not itself violate the Constitution . . .. Indeed, we learn that a similar form of confinement is probably used in almost every jurisdiction in this country and has been described as one of 'the main traditional disciplinary tools' of our prison systems. . . . In several states, however, incarceration in segregated cells seems to be for an indefinite period, as it is in New York. The federal practice appears to be that prisoners shall be retained in solitary 'for as long as necessary to achieve the purposes intended,' sometimes 'indefinitely.' . . . Such analogous practices do not impel us to the conclusion that the Eighth Amendment forbids indefinite confinement under the conditions endured by Sostre for all the reasons asserted by Warden Follette until such time as the prisoner agrees to abide by prison rules—however counter-productive as a correctional measure or however personally abhorrent the practice may seem to some of us." (442 F.2d at 192–193).

LaReau's complaint is that he was not allowed any recreation periods during his close confinement in segregation. However, an overall review of the record discloses 31 trips to the state courts between November 14, 1969 and July 7, 1970;[7] 16 visitors were received; there were 40 trips to the legal room and on 30 occasions he left his cell for miscellaneous reasons.[8]

---

6. Defendants' Exhibit "D–1", "D–3", "D–4", "D–5" and "D–6".

7. Defendants' Exhibit "C".

8. Defendants' Exhibit "E".

The Court recognizes the feasibility of having one hour exercise periods regularly scheduled each day for all prisoners in administrative segregation, where it is practicable. However, this Court cannot say that in light of all the factual circumstances in LaReau's case, he suffered any deprivation of civil rights of constitutional dimension.

The Court finds that LaReau's confinement to the several categories of segregation was not unlawful. The petitioner is neither entitled to monetary damages nor equitable relief. The Court finds the issues on all counts in favor of the defendants; judgment may enter accordingly.

So ordered.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P.

The Court expresses its appreciation to Attorney Hubert J. Santos for his very thorough and scholarly representation of his client, without benefit of any professional fee or remuneration.