473 F.2d 974
 Donald Joseph LaREAU, Petitioner-Appellant,
v.
Ellis C. MacDOUGALL, Commissioner of Correction, State of
Connecticut, and Frederick E. Adams, Warden,
Connecticut Correctional Institution,
Somers, Connecticut,
Respondents-Appellees.
 No. 664, Docket 71-1555.
 United States Court of Appeals,
Second Circuit.
 Argued June 28, 1972.
Decided Dec. 15, 1972.
 
 Hubert J. Santos, Enfield, Conn., for petitioner-appellant.
 Stephen J. O'Neill, Asst. Atty. Gen., State of Conn., Hartford, Conn. (Robert K. Killian, Atty. Gen., State of Conn., Hartford, Conn., on the brief), for respondents-appellees.
 Before MOORE, SMITH and TIMBERS, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 This appeal presents again questions which are being raised with increasing frequency by state prisoners with respect to alleged unconstitutional conduct by state prison officials. The issues are raised here in the context of alleged violations of a state prisoner's First and Eighth Amendment rights in connection with his confinement in a strip cell at the Connecticut state prison.
 
 
 2
 Appellant LaReau, presently an inmate of the Connecticut Correctional Institution at Somers, Connecticut,[1] appeals from a judgment for defendants entered on May 25, 1971 after a four day trial on the merits in the District Court for the District of Connecticut, T. Emmet Clarie, District Judge. The judgment dismissed LaReau's action brought under the Civil Rights Act, 42 U.S.C. Sec. 1983 (1970), and its jurisdictional implementation, 28 U.S.C. Sec. 1343 (1970), seeking equitable relief and $50,000 damages for alleged violations of his rights under the First Amendment (free exercise of religion clause) and the Eighth Amendment (cruel and unusual punishment clause), as well as other alleged constitutional violations not raised on appeal.[2] After trial, Judge Clarie filed a well reasoned opinion setting forth detailed findings of fact and conclusions of law, 354 F.Supp. 1133 (D.Conn.1971), which we affirm in all respects except as indicated below. In short, we affirm on the First Amendment claim and reverse and remand on the Eighth Amendment claim.
 
 I.
 
 3
 Appellant's Eighth Amendment claim is that a disciplinary measure imposed upon him while imprisoned at the Connecticut Correctional Institution at Somers, namely, his confinement in a socalled "strip cell", constituted cruel and unusual punishment.
 
 
 4
 The facts are as follows.[3] On February 3, 1970, correctional officers found in LaReau's possession certain contraband items, including what was variously described by witnesses as "a rope fashioned from parts of a towel" or towels or "a string made from the edges of bed sheets". Because LaReau at that time was in punitive segregation, these items were contraband under prison regulations. A disciplinary proceeding followed on February 5. LaReau was ordered confined in a strip cell for an "indefinite period". He in fact served five days in the strip cell, from February 6 to February 11.[4] He contends that the strip cell in which he was confined is per se unconstitutional or, alternatively, that it was grossly excessive punishment for his violation. We hold, under the circumstances of this case, that his confinement in the strip cell violated his Eighth Amendment rights.
 
 
 5
 The strip cell was described by witnesses at the trial as follows. Its dimensions are six feet wide, ten feet deep and eight feet high, approximately the same size as other cells in the prison. The cell has an outer door made of solid steel and an inner door made of steel bars, with a space of two feet between the two doors. The outer door has a two square foot window at eyelevel which can be covered by a metal plate. Prison officials testified that the window usually is not closed unless the prisoner creates a disturbance. The walls and floor of the cell are cement. The walls have no windows. There is a 100 watt light outside the cell which shines through a hole at the rear of the cell and can be turned on and off only by the guard. Judge Clarie found that this light was turned on for LaReau only at meal times and when he was allowed to write. Thus, it appears that LaReau for substantial periods of time was in almost total darkness when the light was off and the window in the door was closed. He was also in total silence since the walls and door did not permit transmission of sound.
 
 
 6
 The cell contained no sink, water fountain or commode. The only facility for disposing of human waste was a device called a "Chinese toilet". It was merely a hole in the floor in the corner of the cell covered with a grate. It was flushed with water by a manually-controlled valve operated from outside the cell.
 
 
 7
 A prisoner confined to a strip cell apparently is permitted to have a toothbrush and toothpaste upon request. It is normal practice for the prisoner to receive three meals per day. A glass of water is given at least twice daily. A mattress is provided between 3 P.M. and 8 A.M. and blankets are supplied when the room temperature so requires.
 
 
 8
 The prisoner is not allowed to have reading materials (they would be useless in the darkness anyway), except a Bible upon request. He is given no opportunity to exercise. He has no one to talk to or communicate with in any way except that he is permitted to write. A prisoner can be confined in such a cell for a maximum of eight days, but that period can be extended upon approval by the Commissioner of Corrections.
 
 
 9
 The cruel and unusual punishment clause does not forbid all excessive or severe penalties. See Robinson v. California, 370 U.S. 660 (1962).[5] Nor does it give constitutional dimension to the theories of penologists on what is the most appropriate disposition of an offender; the language of the clause is ill-suited to the performance of such a task. It condemns only that punishment which is "barbarous" or "shocking to the conscience". See Church v. Hegstrom, 416 F.2d 449, 451 (2 Cir. 1969). And the "conscience" the clause is concerned with is the collective conscience of our society, not the conscience of judges or prison officials as individuals. See Trop v. Dulles, 356 U.S. 86, 101 (1958).
 
 
 10
 Courts must be particularly careful not to intercede needlessly on behalf of an inmate engaged in a dispute with prison administrators. See Landman v. Peyton, 370 F.2d 135, 141 (4 Cir. 1966); Cullum v. California Dept. of Corrections, 267 F.Supp. 524 (N.D.Cal. 1967). The Eighth Amendment should not be used to divest prison authorities of the administrative discretion necessary to maintain order and discipline in penal institutions. Unless a prisoner is exemplarily punished for violating a prison regulation, he and other prisoners will not be deterred from committing further offenses; and the determination of what punishment is effective and fair considering the nature of the offense and the character of the offender ordinarily should be left to the informed judgment of prison authorities. But prison officials, no less than sentencing judges, are bound by the strictures of the Eighth Amendment. Disciplinary measures that violate civilized standards of human decency are proscribed.
 
 
 11
 We hold that the conditions to which LaReau was subjected in the strip cell fall below the irreducible minimum of decency required by the Eighth Amendment. Enforced isolation and boredom are permissible methods of discipline, although they might not remain so if extended over a long period of time. But the conditions here went beyond mere coerced stagnation. We cannot approve of threatening an inmate's sanity and severing his contacts with reality by placing him in a dark cell almost continuously day and night. Nor can we find any justification for denying a man the ability to maintain his personal cleanliness. What is most offensive to this Court was the use of the "Chinese toilet". Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted. The indecent conditions that existed in this Somers prison strip cell seriously threatened the physical and mental soundness of its unfortunate occupant.[6] In order to preserve the human dignity of inmates and the standards of humanity embraced by our society, we cannot sanction such punishment.[7] See Trop v. Dulles, supra.
 
 
 12
 Since the district court did not reach the issue of what relief should be granted, we remand with directions that the district court frame an appropriate injunction and that it determine what damages, if any, should be awarded. Our remand is not to be construed as any expression of opinion on our part, one way or the other, on the issue of damages.
 
 II.
 
 13
 Appellant's First Amendment claim is that he was denied his constitutional right to free exercise of religion during the periods he was held in various segregation units.
 
 
 14
 A prisoner confined to any segregation unit at the Somers prison, whether it be administrative segregation, punitive segregation, maximum punitive or the strip cell, is not permitted to visit the prison chapel. Catholic mass is performed in the chapel only, with the exception of an occasional service performed in the segregation unit. An inmate in segregation therefore normally cannot attend mass. The Catholic chaplain, however, does make himself available to administer the sacraments-penance and Holy communion-in the segregated unit itself. Chaplain Stanley, the Catholic chaplain at Somers, testified that LaReau never requested his services in the segregation unit but continually demanded access to the chapel. The Chaplain also testified that he had taken care of LaReau's spiritual needs adequately and "to the best of [his] ability".
 
 
 15
 Segregated prisoners are not permitted to attend mass in the chapel, according to the testimony of prison officials, because to allow them to do so would be to invite trouble. Most of these inmates are disciplinary problems and many of them are would-be leaders of mass prison disruption. LaReau, for example, was a compulsive letter-writer and had been involved in several major disputes, including a wisespread hunger strike. To allow him to attend Sunday mass along with the general prison population, according to the prison authorities, would facilitate a major incident by providing the inmates with a rebellious leader.
 
 
 16
 Sherbert v. Verner, 374 U.S. 398 (1963), firmly established that the First Amendment guarantees to every person the right to participate in acts and practices which are an integral part of his religious faith. Sherbert also announced that a balancing principle should be employed to determine whether the free exercise clause has been infringed by a secular regulation: the state can deny a person participation in religious exercises if the state regulation has an important objective and the restraint on religious liberty is reasonably adapted to achieving that objective.
 
 
 17
 Attendance at Sunday mass clearly is a fundamental practice in the Catholic religion. We hold, however, that the prison authorities at Somers have denied segregated prisoners attendance at mass for a substantial reason. See United States ex rel. Cleggett v. Pate, 229 F.Supp. 818 (N.D.Ill.1964). They have made a reasonable judgment, one which we are not inclined to disturb, that unruly prisoners should not be given the opportunity to instigate trouble with the general inmate population. Such a hazard can be avoided only by denying these prisoners access to the chapel for Sunday mass.[8] Judge Clarie found, and the record supports the finding, that LaReau is a potential instigator of large-scale disorder.[9] We therefore affirm the judgment of the court below on the First Amendment claim.
 
 
 18
 Affirmed in part; reversed and remanded in part.
 
 MOORE, Circuit Judge (dissenting):
 
 19
 The Court's opinion appears to contain two findings of violations of LaReau's Eighth Amendment rights. The Court clearly says that it believes the conditions in the strip cell fall below the Constitutional minimum. In footnote six, however, the Court adds:
 
 
 20
 Even if the strip cell could be justified for serious offenses, it was a grossly severe penalty for LaReau's offense.
 
 
 21
 I believe the Court errs in both of these holdings.
 
 
 22
 The majority focuses on two aspects of strip cell confinement which they believe combine to violate the minimum standards of the Eighth Amendment. The "Chinese toilet" and the almost continuous darkness are said to have severed LaReau's "contact with reality" and to have "seriously threatened . . . [his] physical and mental soundness. . . ." Wright v. McMann[1] and Sostre v. McGinnis[2] are cited to support this conclusion. Each of these cases involved fundamentally different factual situations; neither supports this decision.
 
 
 23
 Wright involved two separate strip cell incarcerations of twenty-one and thirty-three days. In addition, the conditions of Wright's incarceration were much more severe than those at Somers. Wright was allegedly required to stand at attention for more than fourteen hours each day, to sleep nude in an unheated cell on a rough concrete floor with the cell's windows open to subfreezing temperatures, and to exist there amidst encrusted filth and slime deposited by previous occupants of that cell. At Somers the maximum permissible stay in the strip cell was eight days.[3] LaReau does not claim to have spent even this much time there.[4] Furthermore, LaReau was never forced to stand at attention or sleep nude on a freezing concrete floor. (At Somers a mattress is provided in the strip cell for seventeen hours each day.) It is also clear that the Somers strip cell was relatively antiseptic when compared to the cell in Wright, which was said to have been covered with the accumulated bodily wastes of its numerous previous occupants. I think it obvious that the allegations in Wright go far beyond the conditions actually experienced by LaReau.
 
 
 24
 The Court states that the conditions in the Somers strip cell fell below the minimum standards set forth in Sostre v. McGinnis.[5] While this may be true with respect to some of these standards, it is also true that the Sostre standards were never meant to be applied to strip cells.
 
 
 25
 The Sostre opinion concerned "punitive segregation" (a less restrictive, less punitive status than the strip cell), and the standards there enunciated were issued in the context of confinements of extensive duration; Sostre had been confined to punitive segregation for more than twelve months. Surely the minimum standards for a less restrictive mode of incarceration should not be applied so as to prohibit strip cell confinements altogether. At the least, it is clear that the Sostre Court never intended such a prohibition.[6] LaReau was placed in the strip cell for violating prison rules applicable to the "administrative segregation" section of the Somers facility. The Sostre court, by specifying standards applicable to solitary confinement, did not intend to eliminate the possibility of disciplining inmates who violate these very rules.[7] Prison authorities must have the option of imposing more restrictive rules and conditions of imprisonment than the general standards of Sostre, if only to insure that their rules implementing these standards are obeyed.
 
 
 26
 Furthermore, it should be obvious that the minimum standards for confinements which may last a year or longer must be higher than those applicable to confinements which by regulation could not be imposed for more than eight days and which at Somers averaged only five days. Sostre, too, is no authority for the decision of the Court here.
 
 
 27
 The most serious flaw in the Court's decision is its determination that the conditions in the Somers strip cell "seriously threatened the physical and mental soundness of its unfortunate occupant." The Court says that it accepts Judge Clarie's "careful and detailed findings of fact."[8] These findings disclose that LaReau had seen the prison's psychiatrist and psychologist, that the prison psychiatric department had an extensive file on LaReau-including several psychiatric evaluations-and that he was visited weekly by the prison doctor. Despite the presence of these medically trained personnel who were acquainted with LaReau and presumably aware of the possible hazards of various aspects of prison life (including the strip cell), the Court today offers its own judgment that the strip cell conditions do, as a matter of law, threaten an inmate's health and sanity. In my opinion it is not our appellate function to ignore the findings of a Judge who, after personally viewing the conditions at Somers, found them to be neither cruel nor unusual. But it is perhaps an even more serious error to substitute for the collective medical expertise of the Somers doctors this Court's judgment that conditions there threatened an inmate's physical and mental soundness. Surely, such a determination should be left to those with knowledge of medicine, psychiatry, and psychology. Such medical judgment should be entitled to great weight in our Court, especially in a case such as this, where the experts also had personal knowledge of the inmate and, presumably, of the conditions he faced.
 
 
 28
 The opinion of the Court further states that even if the conditions in the strip cell were not per se cruel and unusual, confining LaReau there for the mere possession of contraband was a "grossly severe penalty". At the time LaReau was found with his contraband he was in administrative segregation. The more innocuous items found in LaReau's possession[9] would not have been deemed contraband had he not been assigned to this special section of the prison. One of the items of contraband, however, was a rope made from towels. This would have been contraband even if LaReau had been assigned to the general prison population, since rope can be used as a weapon and as a means of escape. Since the Court finds elsewhere in its opinion that LaReau was a "would-be leader of mass prison disruption", it would seem that his possession of a rope would not merely warrant, but demand, the strong disciplinary measures taken in this case. It must be remembered that LaReau had escaped from custody twice in the preceding seven months and that it was for these escapes that he had been placed in administrative segregation. Considering all of these factors, I have no trouble finding that the prison authorities were justified in meting out to LaReau the discipline they felt the situation required.
 
 
 29
 In my opinion this is not a proper case for federal judicial interference in the day-to-day administration of a state prison.[10] There are, of course, occasions when the Federal Courts must step in to protect the Constitutional rights of prisoners. See e. g., Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983 (1971). But here we have a prisoner assigned to a section of Somers set aside for trouble-making inmates, who was found to possess escape materials. This prisoner had been recaptured from his last successful escape only two months before. I cannot agree that under these circumstances we, who are not responsible for administering prisons, should interfere with the judgment of those who are charged with this responsibility.[11] These prison officials are experienced in such matters and familiar with all the facts and circumstances surrounding any particular incident. I believe this makes them much better able to make judgments as to the proper type and duration of disciplinary measures than judges ensconced in the quietude of a Federal Courthouse. In short, the Warden at Somers does not presume to tell us how to solve our problems; I do not think that we are qualified to solve his. Short of the grossest violation of Constitutional rights we should stay within the field of our own competence and not be parties to a possible third escape.
 
 
 30
 I would affirm.
 
 
 
 [1]
 LaReau was convicted in the Superior Court for Hartford County on February 2, 1966 of indecent assault and was sentenced from 2 to 6 years in prison. He was paroled on January 29, 1969 but was returned to prison for parole violation on July 25, 1969, having been arrested for forgery on July 5. He escaped from the Manchester Police Station on August 25, 1969 and from the Hartford Correctional Center on November 16, 1969. On both occasions he had been transferred temporarily from Somers to those facilities to await trial. On both occasions he was recaptured shortly after his escape. On May 29, 1970, he was convicted in the Superior Court for Hartford County of the crime of escape and is presently serving his sentence of from 5 to 11 years for that conviction
 
 
 [2]
 Prior to commencing the instant federal action, LaReau petitioned the Superior Court for Hartford County for a writ of habeas corpus. He alleged, among other illegalities, the same constitutional violations charged here. The Superior Court dismissed the petition on the merits in an opinion rejecting the First and Eighth Amendment claims
 The Superior Court denied LaReau permission to appeal to the Connecticut Supreme Court. LaReau did not seek review in the Supreme Court of the United States.
 Appellee contends that this decision by the Superior Court precludes this Court, under the doctrines of res judicata and collateral estoppel, from reconsidering LaReau's claims. These principles might be binding here were it not for the fact that the Superior Court clearly acted in excess of its authority in ruling on these claims. It is settled in Connecticut that the Superior Court is without power in a "habeas corpus proceeding to inquire into the propriety or legality of any punishment that may have been imposed upon the petitioner". Saia v. Warden, 25 Conn. Supp. 519, 520-21 (Super.Ct., Hartford County, 1964). Under Connecticut law, when a party invokes the jurisdiction of the court with a petition for a writ of habeas corpus, the court is empowered to decide only the validity of the judgment under which the petitioner was imprisoned. Flaherty v. Warden, 155 Conn. 36, 229 A.2d 362 (1967); Wojculewicz v. Cummings, 143 Conn. 624, 124 A.2d 886 (1956). Since the Superior Court's decision here on the claims of mistreatment by prison officials, therefore, would have no binding effect on other state courts, that decision does not preclude a federal court from hearing those claims.
 
 
 [3]
 In view of Judge Clarie's careful and detailed findings of fact, 354 F.Supp. 1135-43, which we accept, Fed.R.Civ.P. 52 (a), we shall not refer in this opinion to any more of the facts than are necessary to an understanding of the issues upon which we rule
 
 
 [4]
 LaReau also claims that he was placed in the strip cell from October 5 to October 12 for writing an "insolent and disrespectful" letter to Assistant Warden Stout. The evidence at trial indicated, however, that he was actually confined in a "maximum punitive" cell which differs from the "strip cell" in several respects and which is not attacked on this appeal
 
 
 [5]
 There can be no doubt today that the Eighth Amendment's prohibition against cruel and unusual punishment applies to the states. Robinson v. California, supra. It also is clear that a state prisoner may bring an action under the Civil Rights Act. Cooper v. Pate, 378 U.S. 546 (1964). See Rodriguez v. McGinnis, 456 F.2d 79 (2 Cir. 1972) (en banc), cert. granted, 407 U.S. 919 (1972), and authorities cited therein at 81. See also United States ex rel. Walker v. Mancusi, 467 F.2d 51, 53-54 (2 Cir. 1972)
 
 
 [6]
 Even if the strip cell could be justified for serious offenses, it was a grossly severe penalty for LaReau's offense. The possession of contraband, even contraband which might conceivably be an instrument of escape, is not sufficiently culpable to justify the extreme deprivations to which LaReau was subjected in the strip cell. Indeed, prison officials admitted at trial that the strip cell normally is reserved for such serious offenses as fighting or rioting
 
 
 [7]
 Conditions similar in some respects to those found to exist here were denounced by this Court in Wright v. McMann, 387 F.2d 519 (2 Cir. 1967). There the plaintiff alleged, among other matters, that he had been placed for 33 days (11 days nude) in a poorly-heated, filthy strip cell, had no means of cleaning himself, and was forced to sleep on a concrete floor. We held that these allegations stated an Eighth Amendment claim. For other decisions condemning strip cells, see Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa. 1969) (no windows or light, poor sanitary conditions, lack of hygenic materials); Hancock v. Avery, 301 F.Supp. 786 (M.D. Tenn.1969) (unlighted, no furnishings, "oriental" toilet flushed from outside, poor sanitary conditions); Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966) (no furnishings, "oriental" toilet flushed from outside, totally dark, no hygenic materials)
 In Sostre v. McGinnis, 442 F.2d 178 (2 Cir. 1971) (en banc), cert. denied sub nom. Sostre v. Oswald, 404 U.S. 1049 (1972), we held that segregated confinement for long periods is not violative of the Eighth Amendment when the following conditions exist: basic implements of personal hygiene, opportunity for exercise, reading matter, communication with other prisoners. Many of the favorable conditions specified in Sostre obviously were not present at LaReau's confinement.
 
 
 [8]
 This is not a case where prison officials have discriminated against a particular religion or religious sect. See Sewell v. Pegelow, 291 F.2d 196 (4 Cir. 1961)
 
 
 [9]
 This is not to say that every prisoner in segregation lawfully can be prevented from attending church services in the chapel. Not all segregated prisoners are potential troublemakers; so some discrimination must be made by prison authorities among the inmates in the segregation unit
 
 
 [1]
 387 F.2d 519 (2d Cir. 1967)
 
 
 [2]
 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, cert. denied, 405 U.S. 978 (1972)
 
 
 [3]
 The Commissioner of the Connecticut Department of Corrections can, on application, extend this time. He testified at trial that no such application had ever been made
 
 
 [4]
 LaReau spent from February 6, 1970, to February 11, 1970, in the strip cells
 
 
 [5]
 See note seven to the Court's opinion
 
 
 [6]
 In Sostre the Court said:
 For a Federal Court, however, to place a punishment beyond the power of a state to impose on an inmate is a drastic interference with the state's free political and administrative processes.
 442 F.2d at 191.
 
 
 [7]
 It is not clear that the "solitary confinement" or "punitive segregation" status in Sostre (which dealt with a New York state prison) is precisely analogous to the "administrative segregation" status in Connecticut's prisons. It is clear, however, that the Sostre court was not dealing with the most severe form of disciplinary segregation in the New York State prison system. Compare Sostre v. McGinnis, supra, with Wright v. McMann, supra. The strip cell confinement we are considering here is the most severe mode of confinement at Somers. There is absolutely no indication in Sostre that the Court was there establishing the minimum Constitutional standards for all forms of incarceration
 
 
 [8]
 See note three to the Court's opinion
 
 
 [9]
 These items included a newspaper, a magazine, a pencil, instant coffee, and Preem. LaReau v. MacDougall, 354 F.Supp. 1133 (D.Conn.1971)
 
 
 [10]
 I believe the majority ignores the clear import of the cases in this Circuit and in the Supreme Court when it finds that this case warrants federal court interference with the operation of the Somers prison. "There is no doubt that discipline and administration of state detention facilities are state functions. They are subject to federal authority only where paramount federal constitutional or statutory rights supervene." Johnson v. Avery, 393 U.S. 483, 486 (1969). "States should be given broad discretion to determine which of a variety of possible rehabilitative and disciplinary techniques will be most effective with a given prisoner in a given situation." Baldwin v. Smith, 446 F.2d 1043, 1044 (2d Cir. 1971)
 
 
 [11]
 In Sostre v. McGinnis, supra, the Court said:
 It is not only that we, trained as judges, lack expertise in prison administration. Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us as a federal court to command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or personally repugnant.
 442 F.2d at 191 (emphasis in original).