**Anatolis FOMINAS, Plaintiff,**

v.

**Walter R. KELLY, George Schweitcer, Mike Czernick and John Saravullo, Defendants.[1]**

**No. CIV–86–1127E.**

United States District Court,
W.D. New York.

June 13, 1990.

---

**1.** Defendant Schweitcer's surname actually is Schweitzer and defendant Czernick's is Czerniak. *See* Memorandum and Order, dated August 18, 1988, at p. 1 fn. 1. These defendants' proper names will be employed herein.

Anatolis Fominas, pro se.

William Maldovan, Asst. Atty. Gen., Buffalo, N.Y., for defendants.

## MEMORANDUM AND ORDER

### ELFVIN, District Judge.

The abovenamed *pro se* plaintiff is an inmate in New York's corrections system. He alleges that, while confined to the Attica Correctional Facility ("Attica") between August and November of 1986, he was harassed by the defendant corrections officers because of his Islamic faith and in violation of his constitutional rights. Compensatory and punitive damages have been sought along with declaratory and injunctive relief. *See* 42 U.S.C. § 1983.

A two-day bench trial was held before the undersigned February 1–2, 1990. The plaintiff introduced his own testimony as well as the hostile testimony of all three remaining defendants, corrections officers George Schweitzer, Mike Czerniak and John Saravullo.[2] He introduced no physical exhibits. Each of the defendants also testified in his own behalf and their counsel, Assistant State Attorney General William D. Maldovan, introduced several physical exhibits.[3] Set forth below are this Court's findings of fact and conclusions of law.[4]

The plaintiff, an avowed Muslim,[5] testified that on August 27, 1986, while in the process of his transferring his possessions from a cell in the Attica general population to an Intermediate Care Program ("ICP") cell, Schweitzer had observed him wearing a "kufi," an Islamic religious cap.[6] Schweitzer supposedly cursed at him and told him that he would not be permitted to wear his kufi in his new cell block, where Schweitzer was a supervising corrections officer. Schweitzer is said to have also

2. *See* footnote 8 hereinbelow with respect to the dismissal of the fourth defendant.

3. Those exhibits received in evidence from the defendants are Defendants' Exhibits 2–6, 8–9, 25, 27–30 and 32. *See Letter from this Court to the plaintiff* (dated February 20, 1990).

4. The parties declined to commission a written transcript of the trial proceedings. Hence, this Court's findings are based on the undersigned's memory and his contemporaneous handwritten notes of events as supplemented by the audiotaped record.

5. The plaintiff testified that he was born a Muslim and had practiced Islam most of his life. The defendants' counsel, however, introduced a document, endorsed by the plaintiff and dated July 2, 1987 (several months after the events complained of), requesting that his inmate records be changed to reflect this religious preference. Formerly, these records regarded him as a Catholic. *See* Defendants' Exhibit 32. When confronted with such document under cross-examination, the plaintiff said that under Islamic belief "a real Christian is a Muslim" and that the formal change in his records was effected to preserve his right to purchase prayer oils from outside the prison.

Whatever the practical and theological implications of these semantics, the contemporaneous evidence reveals that at the time of the events complained of, in Autumn 1986, the plaintiff regarded himself as and held himself out to be a Muslim. *See* Defendants' Exhibit 6 (endorsed by the plaintiff September 15, 1986) (grievance against harassment by Schweitzer "* * * so that I may continue to practice my faith and belief in Islam").

6. According to the plaintiff, a kufi is both an emblematic "badge" of the Muslim faith, distinguishing its adherents from others, and also integral prayer garb. He analogized it to the Jewish skull-cap or yamalka.

refused to permit the plaintiff to retrieve certain of his property from his former cell. The plaintiff thereby lost clothes, books and cassette tapes.

While in his new cell, the plaintiff said he was periodically cursed by Schweitzer as, *inter alia,* a "stinking Muslim" and was warned not to wear a kufi. Schweitzer would sometimes enter the plaintiff's cell and disturb his belongings, tossing his books from their shelves, spilling his prayer oils [7] and "stuff[ing] up" his toilet with his kufis. The plaintiff complained at the time about Schweitzer's activities to the Attica superintendent, Walter R. Kelly.[8] *See* Defendants' Exhibits 2, 3 and 6 (dated September 28th, 24th and 15th). These complaints roughly echo the plaintiff's in-court testimony that Schweitzer was pursuing a systematic program of harassment against him because of his religion.

The plaintiff further testified that, following his complaints against Schweitzer, Czerniak approached him and offered him certain favors in exchange for dropping these complaints. When the plaintiff demurred, Czerniak told him that his family would see him "in a pine box." The plaintiff complained to Kelly about Czerniak's overture and threat in a letter dated September 25, 1986. *See* Defendants' Exhibit 4 (dated September 25, 1986). Czerniak thereafter proceeded to join in the harassment of the plaintiff, turning off the water in his cell, taunting him by repeatedly opening his cell door,[9] and once attempting to poke him in the eye with a pen. Again, the plaintiff complained without avail to Kelly. *See* Defendant's Exhibit 5 (dated September 27, 1986).

The plaintiff also testified that toward the end of October 1986, Saravullo as well began harassing him. Saravullo purportedly "shook [him] down" daily and ripped his clothesline from his cell wall. Saravullo, he said, also prevented him from visiting the Attica law library and solicited other inmates to set a fire in the plaintiff's cell, which they did. Finally, Saravullo had sometimes searched his cell without writing up a search "slip," which he was supposedly required to do under prison regulations. There is no evidence of the plaintiff having lodged a contemporaneous complaint against Saravullo with the Attica superintendent, however.

Under cross-examination, the plaintiff conceded that he had not personally witnessed any of the defendants destroying his property or shutting off the water to his cell.

Schweitzer testified that he has been an Attica corrections officer for eight years and was working in the prison's ICP unit in Autumn 1986. He said that the ICP houses inmates with behavioral, hygienic or mental difficulties which render them unsuitable for the general inmate population. The unit contains two "galleries" of thirty-nine inmates each, seventy-eight in all, and is staffed by three corrections officers, two nurses, a psychological counselor, rehabilitation counselor and recreational therapist. Catwalks exist behind the cells, enabling the corrections officers to access plumbing and air vents.

Schweitzer did not recall the plaintiff's transfer to the ICP unit in August 1986 but admitted that it was his responsibility to ensure that transferred inmates arrived at their new cell "without a hitch." An inmate was responsible for transporting his

---

7. According to the plaintiff, Muslim religious oils are used for purification purposes during each of five daily prayers. Unlike a kufi the oils are not an essential accessory to prayer but nevertheless render prayer "more meaningful."

8. Kelly was dismissed from the suit for lack of any allegation of his personal involvement in the conduct complained of. *See* Memorandum and Order, dated August 18, 1988. However, a supervising official may be personally involved in a constitutional deprivation by failing to remedy a wrong after learning of it. *Williams v.*

*Smith,* 781 F.2d 319, 323 (2d Cir.1986). The plaintiff alleged as much and, therefore, Kelly should have been retained in this suit. Yet, because of the verdicts this Court reaches hereinbelow, the error is without consequence.

9. The plaintiff testified that this was done from a mechanical box down the hall from his cell and that Czerniak would open the door some fifty times during the course of an hour, each time necessitating that the plaintiff leave his cell in accordance with prison regulations.

own belongings himself and this would usually be accomplished by wrapping items in blankets and placing them in carts, which would be handpushed from one cell to the other for as many trips as would be required.

Schweitzer denied all of the plaintiffs charges as "lies." He said he had lodged an "Inmate Misbehavior Report" against the plaintiff October 2, 1986 for the prisoner's having made "false" complaints against him. *See* Defendant's Exhibit 9. Following a disciplinary hearing October 8th, the plaintiff was found "not guilty" of "lying" and "harass[ment]" but was required to undergo counselling for a "mental problem." *Ibid.*

Czerniak testified that he had worked in the Attica ICP unit from 1984 through late 1986.[10] He denied having ever threatened the plaintiff or made remarks about his religion. He also denied having taunted the plaintiff by playing with the "lockbox" controlling the opening and closing of the cell doors and having shut off the water to the plaintiff's cell.[11]

Saravullo testified that he was assigned to the Attica ICP unit in August 1986 and continues to work there. He had originally been a "relief officer" assigned to spell officers on regular shifts when they were off-duty. He did not recall having ever worked together on a shift with either of Schweitzer or Czerniak. Saravullo denied having harassed the plaintiff or having made undocumented searches of his cell. He did twice make random searches of the plaintiff's cell during Autumn 1986, he acknowledged, each time preparing a cell search slip. *See* Defendants' Exhibit 19 (search slips dated September 28 and November 6 and endorsed by Saravullo).

■■ Limitations upon a prisoner's freedom of religion are permitted only if the restraint is reasonably related to an important state objective.[12] *Shabazz v.*

*Coughlin,* 852 F.2d 697, 700 (2d Cir.1988); *LaReau v. MacDougall,* 473 F.2d 974, 979 (2d Cir.1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); *e.g., Burgin v. Henderson,* 536 F.2d 501, 504 (2d Cir.1976) (remand to district court to determine whether a prison rule prohibiting the wearing of Muslim prayer caps was justified by an institutional interest in preventing hidden weapons); *see also Butler–Bey v. Frey,* 811 F.2d 449, 451 (8th Cir.1987) (restriction on wearing Muslim prayer caps upheld). A natural corollary is that a corrections officer may not maliciously interfere with an inmate's permissible religious practices or harass him because of such practices.

■■ The burden, however, is on the inmate to establish that his right to freely exercise his religion has been infringed. *Butler–Bey v. Frey, supra,* at 451. Here, the plaintiff has failed to carry that burden by the preponderance of the evidence introduced at trial. Essentially, the evidence consists of the contradictory testimony of the plaintiff and of each of the three remaining defendants. In the absence of an articulable basis for doubting the credibility of any of these defendants, the plaintiff's testimony alone cannot outweigh their adverse testimony. And it is axiomatic that where the evidence is equally stacked the party who bears the burden must lose.

Accordingly, it is hereby ORDERED that the Clerk of this Court shall enter a judgment in this matter reflecting this Court's verdicts following bench trial of no cause of action versus each of the defendants.

---

10. Czerniak testified that he currently is a corrections officer at the Wende (N.Y.) Corrections Facility.

11. Czerniak admitted that it was feasible for a corrections officer to selectively deprive an individual cell of water.

12. New York's Department of Correctional Services has not restricted the wearing of kufis by Islamic inmates in any areas of its facilities. *See Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990).