**Richard Akbar SALAHUDDIN, Plaintiff,**

**v.**

**Thomas A. COUGHLIN, III, et al., Defendants.**

No. 88 Civ. 5754(JSR).

United States District Court, S.D. New York.

March 31, 1998.

As Amended June 2, 1998.

Richard Akbar Salahuddin, Brooklyn, NY, Pro se.

Office of the Attorney General, New York City, for Defendants.

## ORDER

RAKOFF, District Judge.

On March 11, 1998, the Honorable Andrew J. Peck, United States Magistrate Judge, filed a Report and Recommendation recommending that defendants' motion for summary judgment be granted as to defendants Coughlin and Lewis and denied in all other respects. No objections to Magistrate Judge Peck's report have been filed, and, for that reason alone, all parties have waived further review of the decision. *See United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *Frank v. Johnson,* 968 F.2d 298, 300 (2d

Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992).

Accordingly, the Court hereby adopts the Report and Recommendation, and, for the reasons articulated therein, grants defendants' motion for summary judgment as to defendants Coughlin and Lewis and denies it in all other respects. As directed by Magistrate Judge Peck, the parties are to file a joint pre-trial order, which must comply with this Court's Individual Rules, by no later than April 15, 1998.

SO ORDERED.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

To the Honorable Jed S. Rakoff, United States District Judge.

In an earlier round in this case, the Second Circuit held that "[i]t is well established that prisoners have a constitutional right to participate in congregate religious services .... Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993). Familiarity with that decision is assumed. On remand, the parties engaged in discovery and defendants now renew their motion for summary judgment. Defendants contend that (1) they denied Salahuddin's participation in congregate religious services for legitimate penalogical reasons, (2) they are entitled to qualified immunity, and (3) they were not personally involved in any alleged deprivation of Salahuddin's Constitutional rights. For the reasons set forth below, the Court recommends denial of defendants' summary judgment motion because (1) issues of fact exist as to whether defendants' denial of Salahuddin's participation in congregate religious services was justified by legitimate penalogical reasons, (3) defendants are not entitled to qualified immunity because the law in the Second Circuit in 1985 was clear that prisoners, including keeplocked prisoners, could not be denied participation in congregate religious services without valid individualized determinations, and (3) defendants Robert Kuhlman, Ernest Edwards, Napoleon Mitchell and Frank McCrea, but not defendant Thomas A. Coughlin, III, were

personally involved. The Court further recommends granting summary judgment to defendants Coughlin and "Lewis" for lack of personal involvement. Finally, the Court requires defense counsel to show cause why he should not be sanctioned pursuant to Fed. R.Civ.P. 11 and/or 28 U.S.C. § 1927.

## FACTS

### Plaintiff Salahuddin's Transfer to Sullivan

Due to overcrowding in the prison system, the New York State Department of Corrections ("DOCS") decided to transfer inmates to Sullivan Correctional Facility in July 1985, although construction on that maximum security prison had not yet been completed. (Defs.' 56.1 Stmt. ¶¶ 1–4; Hitchen Aff. ¶ 3; Edwards Aff. ¶ 2; Salahuddin 56.1 Stmt.[1] ¶ 4; Salahuddin Aff. ¶ 5 & Ex. CC.)[2] Sullivan was not yet capable of handling general population inmates because it could not provide them with necessary programs. (Defs.' 56.1 Stmt. ¶ 4; Hitchen Aff. ¶ 4; see Salahuddin 56.1 Stmt. ¶¶ 4, 10; Salahuddin Aff. ¶¶ 5–6 & Ex. CC.) Therefore, DOCS decided that only inmates who were subject to disciplinary confinement in their cells, known as "keeplock" status, would be transferred to Sullivan. (Defs.' 56.1 Stmt. ¶ 4; Hitchen Aff. ¶ 4; Edwards Aff. ¶ 2; Salahuddin 56.1 Stmt. ¶ 4; Salahuddin Aff. ¶ 5.)

Chester Clark, Director of Classification and Movement, the subdivision of DOCS that deals with prisoner movement among prisons, directed personnel at the men's maximum security prisons to select keeplocked inmates for transfer to Sullivan. (Defs.' 56.1 Stmt. ¶ 5; Hitchen Aff. ¶¶ 2, 4; Salahuddin 56.1 Stmt. ¶ 5; Salahuddin Aff. ¶ 5.) Plaintiff Richard Akbar Salahuddin,[3] an inmate at Auburn Correctional facility who had been keeplocked for violating prison rules, was selected for transfer to Sullivan by Joseph Costello, Auburn's Deputy Superintendent.

(Defs.' 56.1 Stmt. ¶¶ 6–9; Hitchen Aff. ¶¶ 5, 6 & Ex. B; Salahuddin 56.1 Stmt. ¶ 6; Salahuddin Aff. ¶ 5.) Salahuddin arrived at Sullivan on August 7, 1985 and was placed in keeplock. (Defs.' 56.1 Stmt. ¶ 31; Hitchen Aff. ¶ 6; Edwards Aff. ¶ 8; Salahuddin Aff. Ex. B: Salahuddin Dep. at 8, 28; Salahuddin Aff. Ex. A.)

Soon after his arrival, a counselor at Sullivan realized, upon review of Salahuddin's files, that Salahuddin's transfer to Sullivan had been a mistake since his keeplock stay was scheduled to expire on August 23, 1985, just 16 days after his arrival. (Hitchen Aff. ¶ 8 & Ex. C; Salahuddin Dep. at 41.) Salahuddin was released from keeplock as scheduled on August 23. (Salahuddin Dep. at 38, 41, 58.) Salahuddin was transferred, on an expedited basis, from Sullivan back to Auburn on August 30, 1995. (Defs.' Br. at 4; Defs.' 56.1 Stmt. ¶ 49; Hitchens Aff. ¶¶ 9, 10 & Ex. C; Edwards Aff. ¶ 12 & Ex. E; Salahuddin Aff. Ex. A.)

When Salahuddin had arrived at Sullivan, there were three categories of inmates at Sullivan: (1) keeplocked inmates; (2) cadre inmates, who were maximum or medium security inmates who had volunteered for transfer and cleaned and served food at Sullivan; and (3) Annex inmates, housed only in Sullivan's Annex facility, who were minimum security inmates that worked in the community surrounding Sullivan, as well as in Sullivan as custodians and food service workers. (Defs.' 56.1 Stmt. ¶ 13; Edwards Aff. ¶ 4; Salahuddin 56.1 Stmt. ¶ 17; Salahuddin Aff. ¶ 11.)

### DOCS' Denial of Salahuddin's Requests to Attend Congregate Muslim Religious Services

Salahuddin, a practicing Muslim, had been permitted to attend congregate religious services at Auburn, even while in keeplock. (Salahuddin Dep. at 9, 15–18.) After his

---

1. Although Salahuddin has titled this document "Plaintiff's Statement Pursuant to Local Civil Rule Section 56.1," he has also sworn to its truth, and the Court, therefore, will give it the evidentiary effect of an additional affidavit.

2. Salahuddin denies that DOCS was under severe overpopulation pressure (Salahuddin 56.1

Stmt. ¶ 12; Salahuddin Aff. ¶ 9), but that factual dispute is not material to decision of the summary judgment motion.

3. Plaintiff Richard Akbar Salahuddin was known by DOCS as Richard Brown. (Hitchen Aff. ¶ 5 & Ex. C; Salahuddin Aff. Exs. A, P, R, Z.)

transfer to Sullivan, Salahuddin sought to participate in certain Muslim congregate religious services. (*E.g.,* Defs.' Br. at 4; Salahuddin Dep. at 31.) He made his first such request on August 7, 1985, the day he arrived at Sullivan. (Salahuddin Dep. at 31.)

DOCS asserts that, for a variety of reasons, DOCS generally does not commingle maximum and minimum security inmates. (Defs.' 56.1 Stmt. ¶¶ 15–24; Edwards Aff. ¶ 5; *but see* Salahuddin 56.1 Stmt. ¶¶ 26–32 & Salahuddin Aff. ¶ 17 & Ex. L.) DOCS also asserts that it generally does not permit keeplocked inmates to commingle with other inmates, keeplocked or not, because they pose increased security risks due to their violation of prison rules. (Defs.' 56.1 Stmt. ¶¶ 25–27; Edwards Aff. ¶¶ 6, 10; *but see* Salahuddin 56.1 Stmt. ¶¶ 34–36; Salahuddin Aff. ¶ 18 & Ex. L; Salahuddin Dep. at 8–9, 14–18.) According to DOCS' affidavit testimony, Sullivan was "not equipped to provide congregate religious services to maximum security inmates of any religion when Sullivan first opened." (Edwards Aff. ¶ 11.) DOCS asserts that only Annex and cadre inmates were allowed to participate in congregate religious services when Sullivan first opened. (Defs.' 56 .1 Stmt. ¶ 14; Edwards Aff. ¶ 4.) [4]

Salahuddin, however, asserts that congregate religious services were available, for religions other than Muslim, to all Sullivan prisoners, including those in keeplock, and he submits numerous Sullivan memoranda to support his contention. (Salahuddin 56.1 Stmt. ¶¶ 18–20, 38, 48–49; Salahuddin Aff. ¶¶ 12, 23–24 & Exs. C (8/9/85 Religious Service Request Form), D (8/12/85 Memo), E (8/26/85 Memo), F (9/4/85 Memo), G (9/30/85 Memo), H (10/24/85 Memo), I (10/28/85 Memo), J (12/2/85 Memo), N (8/19/85 Memo), & O (8/22/85 Memo).)

For example, a Sullivan memo from Deputy Superintendent Edwards (the same defendant Edwards who submitted an affidavit in support of defendants' summary judgment motion) to "All Housing Unit Officers" dated August 9, 1995—just two days after Salahuddin's arrival at Sullivan—stated:

On Sundays, Religious Services will be held by Rev. Ortquist. Any inmate who wishes to attend will fill out the attached form and return it to my office for approval or denial.

(Salahuddin Aff. Ex. C.) The attached form made clear that this directive applied to keeplocked inmates, for it was headed at the top: "Request to attend scheduled Religious Services by keeplocked inmate." (*Id.*)

The minutes of an August 12, 1985 Sullivan "Executive Team Meeting" state that:

Rev. Ortquist requested that we coordinate religious services for all denominations. Chaplain Latif, Muslim Iman is on vacation this week, therefore, will not be available.

(Salahuddin Aff. Ex. D ¶ 7.)

The August 19, 1985 Executive Team Meeting minutes state:

*Religious Services:*

Rev. Ortquist reported that the weekend services went well. He also advised the executive team that the inmates questioned the form letter that was sent out relative to attending scheduled religious services. The Catholic inmates wanted to know when a Chaplain would be available to them. Albany is making arrangements to have a Catholic Chaplain assigned to this facility. The biggest complaint that Rev. Ortquist received from the inmates was the lack of commissary buys. Chaplain Latif, Muslim Iman, is expected Wednesday from Woodbourne C.F. A Muslim holiday will be celebrated shortly and therefore, an appropriate meal should be prepared for the occasion.

(Salahuddin Aff. Ex. N at 1.) Nevertheless, by August 22, 1985, Rev. Ortquist wrote a memo to Supt. Kuhlmann noting that "the decision not to celebrate this [Feast of Idul–Adah] special religious service has been made," at least for keeplocked prisoners. (Salahuddin Aff. Ex. O.)

The August 26, 1985 "Executive Team Meeting" minutes stated:

Religious Services:

Rev. Ortquist has contacted Albany Ministerial Services in an attempt to have some-

---

4. The Court notes an internal inconsistency in DOCS affidavits—some cadre inmates are maximum security inmates, but apparently they were allowed to participate in congregate religious services.

one sent to [Sullivan] to perform Catholic Services until a permanent Catholic Chaplain is assigned here. Muslim inmates should be advised that they may pray in their cells until a Muslim Chaplain shows to perform religious services. The Superintendent has contacted local churches to obtain a Chaplain to perform religious services at [Sullivan].

(Salahuddin Aff. Ex. E at 2.)

By September 30, 1985, the Sullivan Executive Team Meeting minutes show that "religious services are running smoothly . . . [but] Rev. Ortquist advised that Iman Latif has not been present at this facility to perform religious services, and so the Muslim population have [sic] been complaining." (Salahuddin Aff. Ex. G at 3; *see also* Salahuddin Aff. Ex. L.)[5]

As a keeplocked inmate at Sullivan in August 1985, Salahuddin was denied the ability to participate in three Friday night Jumu'ah[6] congregate religious services and congregate religious services for the holiday of Eid–ul–Adha.[7] (Defs.' Br. at 4; Salahuddin Dep. at 29–31, 60–61.) Salahuddin also was denied access to one Friday night Jumu'ah congregate religious service after his keeplock period had ended. (Salahuddin 56.1 Stmt. ¶ 23; Salahuddin Aff. ¶ 15; Salahuddin Dep. at 30, 60–61.)

Defendant Ernest Edwards, who was Deputy Superintendent at Sullivan in 1985,[8] submitted an affidavit in support of defendants' summary judgment motion which opined, based on his current review, for the current litigation, of Salahuddin's disciplinary records, that Salahuddin was not suitable to participate in congregate services in August 1985. (Defs.' 56.1 Stmt. ¶¶ 29–41; Edwards Aff. ¶¶ 1, 8–9 & Ex. D.) Salahuddin opposes Edwards' conclusions, and challenges the accuracy of a computer report relied upon by Edwards. (Salahuddin Aff. ¶¶ 19–31.) Edwards based his conclusion upon Salahuddin's alleged poor custodial adjustment and alleged repeated rule violations. (Defs.' 56.1 Stmt. ¶¶ 29–41; Edwards Aff. ¶¶ 8–9 & Exs. D, E; Hitchen Aff. Exs. B, C.) Among the rules Salahuddin allegedly had broken were those against assault and possessing contraband, violations that Edwards felt were particularly relevant because tools were strewn about Sullivan due to the ongoing construction. (Defs.' 56.1 Stmt. ¶¶ 37–38; Edwards Aff. ¶ 8.) Salahuddin responds that if this truly had been a concern, it could have been "nullified via a search of my person before and after I attended services, including handcuffing my person before and after services and not escorting my person via the construction site." (Salahuddin 56.1 Stmt. ¶ 42; *see also* Salahuddin Aff. ¶ 20.)

Salahuddin has submitted a November 26, 1982 DOCS Directive No. 4202 concerning "Religious Programs and Practices." (Salahuddin Aff. Ex. P.) The Directive requires denial of a keeplocked inmate's request to attend religious services to be in writing and to state the reasons for the decision. (Salahuddin Aff. Ex. P, ¶ H(4).)[9] There is no evidence that this was done in this case.

### PROCEDURAL HISTORY

Salahuddin filed a pro se complaint with this Court, asserting *inter alia* that his reli-

---

**5.** It appears that Iman Latif was fired, and a new Muslim Iman was not on board at Sullivan until December 1985. (*See* Salahuddin Aff. Ex. J at 3; Salahuddin Aff. Ex. L.)

**6.** "Participation in Jumu'ah is the central observance of Islam. It is commanded by the Qur'an (the principal book of the Muslim religion), see Qur'an 62:9–10, must be held on Friday afternoon and must be performed congregationally rather than individually. Jumu'ah has been compared in importance 'to the Saturday service of the Jewish faith and the Sunday service of the various Christian sects.'" *Salahuddin v. Coughlin,* 993 F.2d 306, 307 (2d Cir.1993).

**7.** "According to the tenets of Islam, Eid–ul–Adha is an important Muslim festival." *Salahuddin v. Coughlin,* 993 F.2d at 307.

**8.** Edwards is now Superintendent of Otisville Correctional Facility. (Edwards Aff. ¶ 1.)

**9.** In relevant part, Directive 4202 reads as follows:

ATTENDANCE AT CONGREGATE RELIGIOUS SERVICES BY KEEPLOCKED INMATES

1. Whenever an inmate is placed in keeplock status or confined to his cell or room other than in a special housing unit pursuant to 7 NYCRR § 251.6, he shall be notified in writing, in both english and spanish, upon the commencement of such keeplock or confinement, that he may request permission to attend regularly scheduled congregate religious services.

2. Such request shall be made in writing to the Deputy Superintendent for Security or

gious liberty had been violated.[10]  *See Salahuddin v. Coughlin*, 993 F.2d 306, 307 (2d Cir.1993).  The district court found that DOCS had acted reasonably and, therefore, granted summary judgment against Salahuddin on his free exercise claim:

"[DOCS] acted reasonably in transferring keeplocked inmates to Sullivan before construction was complete to avoid overcrowding at other facilities, despite the temporary unavailability at Sullivan of programs and congregate religious services.  Salahuddin's constitutional claim on this ground is denied."

*Salahuddin v. Coughlin*, 993 F.2d at 308 (quoting district court decision).

On appeal, the Second Circuit reversed the dismissal of Salahuddin's free exercise of religion claim.  The Second Circuit first reviewed the law as to keeplocked prisoners' rights to attend religious services:

It is well established that prisoners have a constitutional right to participate in congregate religious services.  *Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989).  Confinement in keep-

lock does not deprive prisoners of this right.  *Id.* A prisoner's right to practice his religion is, however, not absolute.  *See Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).

In *O'Lone v. Estate of Shabazz*, the Supreme Court held that prison regulations alleged to infringe prisoners' free exercise rights are to be judged by a "reasonableness" standard less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.  482 U.S. at 349, 107 S.Ct. at 2404-05.  In evaluating the constitutionality of a restriction, four factors are considered:

(1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; (2) whether the inmates have alternative means to exercise the right; (3) the impact that accommodation of the right will have on the prison system; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin*, 905 F.2d at 574.

*Salahuddin v. Coughlin*, 993 F.2d at 308-09.

Applying that law to the record then before it, the Second Circuit reversed and re-

---

his designee, a Lieutenant or higher, and the senior Chaplain using Request To Attend Scheduled Religious Service by Keeplocked Inmate (Form -2135).  See attachment "B." These requests shall contain the inmates name, identification number, cell location, and date and time of the service he wants to attend, and will be made available to inmates upon their first appearance before the Adjustment Committee.  Such requests must be submitted 48 hours before the scheduled service unless the inmate has been placed in keeplock or confinement less than 48 hours before the service period.  In such a case, the request must be submitted with 24 hours after the inmate has been placed in keeplock or confined.  A separate request must submitted for each religious services the inmate desires to attend.

3.  All requests shall be reviewed by the deputy superintendent for security or his designee, a lieutenant or higher, and the senior Chaplain but in no event shall the reviewing official be a person who participated in any investigation of the acts complained of in the misbehavior report which led to the inmate's confinement or keeplock, or who was a witness to those acts.

NOTE:  Final decision remains with the deputy superintendent for security.

4.  Permission to attend congregate services shall be granted to inmates in keeplock unless, in the judgment of the reviewing official, the inmates presence at such services would create a threat to the safe and secure operation of the facility.  In reaching this determination, the reviewing official shall take into consideration the following factors: a.  the current misbehavior infraction for which the inmate was placed in keeplock; b.  the inmate's adjustment during the current period of confinement in keeplock; c.  the inmate's disciplinary record during the 6 month period prior to the date of the current misbehavior; and d.  denial for any condition other than those set forth in for a, b, or c above must be approved by the superintendent. The reviewing official shall promptly advise the inmate in writing of the determination and the reason for it.

(Salahuddin Aff. Ex. P.)

**10.**  Salahuddin also asserted a number of other claims.  *See Salahuddin v. Coughlin*, 993 F.2d at 303-08 & nn. 1-3.  However, only his free exercise claim is presently before the Court.

manded, on two grounds. First, "the district court did not consider whether it was reasonable for [DOCS] to prohibit congregate religious services at Sullivan." *Salahuddin v. Coughlin,* 993 F.2d at 309. Second, the Second Circuit explained:

> Even assuming a reasonable basis for the denial of Salahuddin's requests, the district court failed to consider whether it was reasonable for [DOCS] to transfer [to Sullivan] inmates who regularly participated in congregate religious services, rather than only those inmates whose constitutional rights would not be compromised by the transfer.

*Salahuddin v. Coughlin,* 993 F.2d at 309. The Second Circuit remanded the case to allow Salahuddin to conduct discovery and "for further proceedings consistent with this opinion." *Id.* The Second Circuit also noted that it "expressed no opinion on the qualified immunity defense raised by [defendants on appeal], since that defense has not yet been asserted in the district court." *Id.*

On remand, before any additional discovery was conducted, defendants moved for summary judgment on qualified immunity grounds. Judge Jones denied defendants' motion, finding that "the right of prisoners to attend congregate religious services was established well before the date of the constitutional deprivations here alleged." *Salahuddin v. Coughlin,* 88 Civ. 5754, 1996 WL 492994 at *4 (S.D.N.Y. Aug.28, 1996). Judge Jones explained:

> *The State of the Law at the Time of the Alleged Deprivation*
>
> Prisoners have a constitutional right to participate in congregate religious services. *Salahuddin, supra,* 993 F.2d 306, 308 (2d Cir.1993) (citing *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989)). The right appears to have found its genesis in *LaReau v. MacDougall,* 473 F.2d 974 (2d Cir.1972), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38

L.Ed.2d 123 (1973), where, in dicta, the Second Circuit found that the right to attend church services could not lawfully be denied to all segregated prisoners without discrimination as to which prisoners posed security risks. *MacDougall,* 473 F.2d at 979–80, n. 9. As early as 1976, the Second Circuit reversed a district court's dismissal of a section 1983 claim that alleged that prison officials unreasonably hampered the ability of prisoners in keeplock to attend chapel services. *See Mawhinney v. Henderson,* 542 F.2d 1 (2d Cir.1976). Accordingly, the right of prisoners to attend congregate religious services was established well before the date of the constitutional deprivations here alleged.

*Salahuddin v. Coughlin,* 1996 WL 492994 at *4.[11]

Judge Jones then turned to the evidence of the reasonableness of defendants' actions, and found it insufficient to establish qualified immunity on the then-existing record:

> [T]he established law at the time of the alleged deprivations indicated not that an impingement of a prisoner's free exercise rights was per se unconstitutional, but that prison officials could not cause such a deprivation unless the impingement was reasonably related to legitimate penological interests.

\*　\*　\*　\*　\*　\*

When reversing the trial court's grant of summary judgment, the Salahuddin panel noted explicitly that the reasonableness of defendants' conduct remained an open question. Specifically, the Court noted that factual issues remained as to whether congregate religious services might have been accommodated at the unfinished facility, notwithstanding defendants' conclusory assertions that they could not. Moreover, even assuming that Sullivan could not accommodate congregate services, it was unclear whether defendants might not have constrained their transfers to that class of keeplock prisoners for which the unavaila-

---

11. Incredibly, and most disturbingly, defense counsel's current summary judgment motion argues that the right of keeplocked prisoners to attend congregate religious services was not clearly established in 1985, and nowhere mentions Judge Jones' decision to the contrary in this very case. (*See* Defs.' Br. at 17.) *See* pages 23–24 below for a further discussion of this and its implications for Rule 11 sanctions.

bility of congregate services would not have resulted in a deprivation of free exercise rights.

Notwithstanding the infirmities identified by the Salahuddin court above, defendants have proffered no new affidavits in support of their renewed motion—only the old ones which, upon initial motion, did not suffice to establish defendants' reasonableness. The very conduct that could not have been found reasonable then can no more easily be found reasonable now without the benefit of additional evidence. Because the assertion of qualified immunity requires this Court to determine whether defendants acted unreasonably and therefore violated plaintiff's right, the factual issue of reasonableness which precluded summary judgment in defendants' first motion continues to preclude summary judgment.

This finding does not foreclose the availability of qualified immunity to defendants. Upon further discovery, it might very well become evident that defendants acted reasonably in denying plaintiff the established right to congregate religious services during his confinement at Sullivan. That inquiry, though, cannot be resolved absent further fact finding, making summary judgment inappropriate.

*Id.* at *4–5.

The case was reassigned to Judge Rakoff and referred to me to supervise discovery and for a Report and Recommendation on the present (*i.e.,* third) summary judgment motion.

## *ANALYSIS*

### I. *SUMMARY JUDGMENT STANDARDS*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991); *Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at *6 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); *Burger v. Litton Indus., Inc.,* 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996)(Peck, M.J.), *report & rec. adopted by* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment—here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994); *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *6; *Burger v. Litton,* 1996 WL 421449 at *7. The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *E.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997) (Peck, M.J.).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *accord, e.g., Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *6. The Court

draws all inferences in favor of the nonmoving party—here, Salahuddin—only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *6; *Burger v. Litton,* 1996 WL 421449 at *7. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM,* 43 F.3d at 37; *see also, e.g., Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *6.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Watson v. McGinnis,* 981 F.Supp. 815, 817–18 (S.D.N.Y.1997) (Peck, M.J.); *Ruiz v. Selsky,* 1997 WL 137448 at *3. To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12; *Watson v. McGinnis,* 981 F.Supp. 815, 817–18; *Shaw v. City of New York,* 95 Civ. 9325, 1997 WL 187352 at *2 (S.D.N.Y. April 15, 1997) (Peck, M.J.); *Ruiz v. Selsky,* 1997 WL 137448 at *3.

■ The Court recognizes that it must "extend extra consideration" to pro se plaintiffs such as Salahuddin; pro se parties are "to be given 'special latitude on summary judgment motions.'" *Reyes v. Koehler,* 815 F.Supp. 109, 112 (S.D.N.Y.1993) (quoting *Mc-*

*Donald v. Doe,* 650 F.Supp. 858, 861 (S.D.N.Y.1986)); *see also, e.g., Valentine v. Honsinger,* 894 F.Supp. 154, 156 (S.D.N.Y. 1995); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1153 (S.D.N.Y.1992).

## II. ISSUES OF FACT EXIST AS TO WHETHER LEGITIMATE PENALOGICAL CONCERNS JUSTIFIED DOCS' DECISION TO NOT PROVIDE SALAHUDDIN WITH CONGREGATE RELIGIOUS SERVICES

■ In its earlier opinion in this case, the Second Circuit explained the law to be applied to prisoner claims for impingement on their religious free exercise rights:

It is well established that prisoners have a constitutional right to participate in congregate religious services. *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989). Confinement in keeplock does not deprive prisoners of this right. *Id.* A prisoner's right to practice his religion is, however, not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).

In *O'Lone v. Estate of Shabazz,* the Supreme Court held that prison regulations alleged to infringe prisoners' free exercise rights are to be judged by a "reasonableness" standard less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. 482 U.S. at 349, 107 S.Ct. at 2404–05. In evaluating the constitutionality of a restriction, four factors are considered:

1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest.

*Benjamin,* 905 F.2d at 574.

*Salahuddin v. Coughlin,* 993 F.2d 306, 308–09 (2d Cir.1993).

■ Defendants argue on several bases that Salahuddin's deprivation was justified by legitimate penalogical objectives. First, defendants argue that "plaintiff was denied participation in congregate religious services because of the dangers posed by congregating only keeplocked inmates for services, or commingling keeplocked inmates with the minimum security inmates," dangers that were heightened due to the construction at Sullivan. (Defs.' Br. at 10; Defs.' 56.1 Stmt. ¶¶ 37–38, 42–43; Edwards Aff. ¶¶ 5–6, 8, 10.) However, Salahuddin has testified and offered evidence—in the form of Sullivan memoranda—that keeplocked inmates of religions other than the Muslim faith were permitted to attend congregate religious services in the same time period, August 1995. (Salahuddin 56.1 Stmt. ¶¶ 18–20, 38, 48–49; Salahuddin Aff. ¶¶ 12, 23–24 & Exs. C, D, E, F, G, H, I, J, N & O.) Therefore, even giving proper deference to DOCS' decisions, issues of fact exist as to the legitimacy of the stated reasons for this deprivation under the first *O'Lone* factor.[12] Thus, defendant's first argument fails.

Second, defendants argue that "[i]n any event, plaintiff's disciplinary record in August, 1985 precluded his participation in congregate religious services even if such services were then available at Sullivan." (Defs.' Br. at 10.) The basis for this argument, however, is an after-the-fact analysis recently performed by Deputy Superintendent Edwards for purposes of this motion, not an analysis performed by any Sullivan official in August 1995.[13] This after-the-fact rationale fails to justify the grant of summary judgment. Salahuddin testified, without contradiction by defendants, that he was permitted to attend congregate religious services at Auburn while in keeplock with the identical disciplinary record. (Salahuddin Dep. at 9, 15–18.) Even giving proper deference to DOCS' decisions, this creates an issue of fact as to the first *O'Lone* factor, the legitimacy of the penalogical interest asserted. While defendants assert that the danger posed by Salahuddin participating in congregate services at Sullivan was greater in light of construction related hazards there, Salahuddin responds that any heightened risk posed by the condition of the Sullivan facility could have been "nullified via a search of my person before and after I attended services, including handcuffing my person before and after services and not escorting my person via the construction site." (Salahuddin 56.1 Stmt. ¶ 42; *see also* Salahuddin Aff. ¶ 20.) Thus, issues of fact require denial of summary judgment on this argument.

## III. QUALIFIED IMMUNITY

The Second Circuit has recently summarized the qualified immunity doctrine, as follows:

Qualified immunity provides vital protection for government officials with discretionary responsibilities. The purpose of the qualified immunity doctrine is to balance the need to protect the rights of citizens through damage remedies, with the opposing need to "protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The Supreme Court in *Butz* ex-

---

12. Further, no evidence has been offered to answer the other question raised by the Second Circuit, *Salahuddin v. Coughlin*, 993 F.2d at 309—why DOCS did not seek to transfer to Sullivan only inmates who did not regularly attend congregate religious services. Therefore, a factual issue exists as to the fourth *O'Lone* factor, the availability of ready alternatives.

13. The Court need not discuss whether one can provide such an explanation at the time of a summary judgment motion, as opposed to when the request to attend congregate services is made. The Court notes that *Mawhinney* seems to require prison authorities to make individualized determinations prior to denial, and defendants do not assert that such a determination was made in Salahuddin's case. *See Mawhinney v. Henderson*, 542 F.2d 1, 3 (2d Cir.1976); *Leon v. Harris*, 489 F.Supp. 221, 225 (S.D.N.Y.1980), both of which are discussed in text at pages 20–21, below. The Court also need not discuss the relevance of the requirement of DOCS Directive 4202 that prison authorities promptly provide the keeplocked inmate with a written contemporaneous explanation for any such denial, which was not done here. (*See* pages 10–11 & n. 9, above.)

pressed its expectation "that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity." *Butz,* 438 U.S. at 508, 98 S.Ct. at 2911–12. As Judge Learned Hand stated, "to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949).

The doctrine of qualified immunity protects government officials from liability for civil damages if the challenged action "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (emphasis added). A right is considered to be "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523. *Danahy v. Buscaglia,* 134 F.3d 1185, 1189–90 (2d Cir.1998); *accord, e.g., Shechter v. Comptroller of New York,* 79 F.3d 265, 268–71 (2d Cir.1996); *Rodriguez v. Phillips,* · 66 F.3d 470, 475–76 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621, 623–24 (2d Cir.1993); *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992); *Francis v. Coughlin,* 891 F.2d 43, 45–46 (2d Cir.1989); *Salahuddin v. Coughlin,* 88 Civ. 5754, 1996 WL 492994 at *3–5 (S.D.N.Y. Aug.28, 1996).

■ The right is considered "clearly established" if it is established by "the decisional law of the Supreme Court or the appropriate circuit court"—here, obviously, the Second Circuit. *Francis v. Coughlin,* 891 F.2d at 46; *accord, e.g., Shechter v. Comptroller,* 79 F.3d at 271; *Rodriguez v. Phillips,* 66 F.3d at 476.

Ignoring Judge Jones August 1996 decision in this case, defendants argue that they were entitled to qualified immunity because the right of keeplocked prisoners to attend congregate religious services was not clearly established in August 1985:

> Plaintiff's right to attend congregate religious services while in keeplock was not "clearly established" in 1985. At that time, prisoners clearly enjoyed the right to free exercise of religion.... However, it was not clear that prisoners who were in disciplinary keeplock were entitled to attend congregate religious services.
>
> In *LaReau v. MacDougall,* 473 F.2d 974 [2d Cir.1972], this Court [sic; the Second Circuit] found that the prisoner who had brought the lawsuit had properly been denied access to congregate religious services. *Id.* at 979. However, in making this decision, the Court noted in dictum that:
>
>> This is not to say that every prisoner in segregation lawfully can be prevented from attending church services in the chapel. Not all segregated prisoners are potential troublemakers; so some discrimination must be made by prison authorities among the inmates in the segregation unit.
>
> *Id.* at 979 n. 9.
>
> This statement hardly established a prisoner's clear right to attend congregate religious services while in keeplock. Not only was it unnecessary to the Court's holding, but it also is in apparent conflict with numerous opinions of other courts [*i.e.,* outside the Second Circuit].

(Defs.' Br. at 17.)

■ The problem with defendants' argument is that it ignores a 1976 Second Circuit opinion (*Mawhinney*) that took *LaReau*'s dicta and extended it to a clear holding, and, even more troubling, ignores Judge Jones' prior holding to that effect in the earlier summary judgment decision, which of course is the law of the case.[14] It is a pleasant surprise to the Court that the pro se brief

---

**14.** It is quite distressing to the Court how badly defendants' brief handled this issue. *See* Rule 11

discussion at pages 23–24, below.

submitted by plaintiff Salahuddin covers the Second Circuit's *Mawhinney* decision quite well:

> 23. . . . *[T]he development of the law in this circuit did not stop with LaReau. Four years later,* in *Mawhinney v. Henderson,* 542 F.2d 1 (2d Cir.1976), *the principal articulated in LaReau, supra, was restated as the central holding* in the case of a New York State prisoner in disciplinary confinement.

> 24. Plaintiff in *Mawhinney, supra,* alleged that he had been deprived access to religious services while in disciplinary status pursuant to a policy then in effect at ACF, the N.Y. State prison in which he was confined, which "arbitrarily denied all prisoners in keep lock or punitative segregation the right to attend religious services or programs without consideration of the offense which had required that special treatment." 542 F.2d at 2. Plaintiff alleged in his complaint that, pursuant to that policy, he had been denied an opportunity to attend church services on several occasions while in keep lock or solitary confinement. The district court dismissed his complaint, ruling that the denial of the right to worship while in segregation did not violate any constitutional right of the plaintiff.

> 25. The 2d Cir. Court of Appeals reversed, relying, in significant part, on its prior holding in *LaReau, supra.* [T]he Court held:

> > Four years ago, this court held that restrictions on religious freedom are permissible only "if the state regulation has an important objective and the restraint on religious liberty is reasonably adapted to achieving that objective." *LaReau v. MacDougall* (cite omitted). . . . In *LaReau,* we further noted that not every prisoner in segregation can be excluded from chapel services; because not all segregated prisoners are potential troublemakers, the prison authorities must make some discrimination among them. *LaReau v. MacDougall,*

*supra,* 473 F.2d at 979 n. 9. Mawhinney alleges that inmates in punitive segregation and keep lock at Auburn are routinely denied participation in chapel services without any determination as to the necessity of their exclusion, and that, in accordance with this policy, he was so excluded on two occasions. These allegations suffice to state a claim. . . . (*Mawhinney, supra,* 542 F.2d at 3.)

> 26. *The Mawhinney, supra, decision, in August 1976, established without doubt that the law in the 2d Circuit required a particularized fact based determination on whether an individual's attendance at group religious services would create a security problem or otherwise be disruptive of legitimate penalogical objectives. A routine and wholesale denial of religious services on account of an inmate's keep lock status was explicitly forbidden.*

> . . .

> 28. *Since the law in the Second Circuit was clear at the time . . . the defense of qualified immunity must be rejected.*

(Salahuddin Br. at 12–15, emphasis added.) [15] *See also Leon v. Harris,* 489 F.Supp. 221, 225 (S.D.N.Y.1980) (following *Mawhinney* ).

The Second Circuit's 1976 *Mawhinney* decision was quite clear. But even if there were any doubt, Judge Jones' decision is the law of the case, and citing *Mawhinney* she concluded that "the right of prisoners to attend congregate religious services was established well before the date of the constitutional deprivations here alleged." *Salahuddin v. Coughlin,* 1996 WL 492994 at *4.

While ignoring *Mawhinney* and Judge Jones' prior decision here, defendants cite *Smith v. Coughlin,* 748 F.2d 783 (2d Cir. 1984), in support of their qualified immunity argument. (Defs.' Br. at 18.) Defendants argue that in *Smith,* "the Second Circuit held that a prison's refusal to allow an inmate, who was housed in the Unit for Condemned Persons, the ability to participate in congregate religious services was fully justified by the prison's reasons for separating the in-

---

**15.** Salahuddin also correctly notes that "[s]ince the law in the Second Circuit was clear at the time, the defendants cannot rely on decisions from other jurisdictions." (Salahuddin Br. at 14.)

mate from the general inmate population." (Defs.' Br. at 18.) This description of *Smith* is misleading. The Second Circuit briefly addressed Smith's claim based on the denial of access to congregate religious services. The Court did not hold that an inmate's residence in segregation was sufficient to justify such a denial; rather, the Court based its decision upon a fact specific inquiry into the reasons for Smith's segregation, and concluded that these same reasons justified denying him access to congregate services. The Court explained:

> Having already concluded, in reviewing Smith's equal protection claims, that there existed good reason to separate him from the general prison population, we also find that the security interests cited in that context are controlling here. These interests fully justified appellees' refusal to allow Smith to attend congregate religious services, and the restriction thus did not violate his first amendment rights.

*Smith v. Coughlin*, 748 F.2d at 789. Reference to the Court's discussion of Smith's equal protection claims reveals the following facts justifying the denial:

> Here, [defendants] have proffered several reasons that demonstrate a rational basis for their special classification and treatment of [Smith]. Smith has proven himself a particularly dangerous person by murdering a prison guard while already serving two life terms. Once sentenced to death, it was not unreasonable to conclude that Smith was unlikely to be deterred from violent behavior by the threat of ordinary sanctions. Moreover, as [prison officials] testified, Smith was himself a likely target for acts of violence committed by prisoners seeking a reputation in the prison setting for dangerousness or "toughness." And finally, as Smith himself admitted, he was depressed. There was testimony, apparently credited by the court below, that condemned persons pose a greater risk of suicide.

*Smith v. Coughlin*, 748 F.2d at 788; *see also Smith v. Coughlin*, 577 F.Supp. 1055, 1062, 1063–64 & nn. 12–13 (S.D.N.Y.1983). Thus, *Smith* does not support defendants' argument. If the Second Circuit, contrary to its *Mawhinney* opinion, felt that keeplock status was sufficient to justify a denial of access to congregate services, discussion of the reasons underlying Smith's segregation would have been unnecessary: Smith's segregated status would have been sufficient, in and of itself, to justify the deprivation. Rather, *Smith* is consistent with *Mawhinney. See also, e.g., Young v. Coughlin*, 866 F.2d 567, 570 (2d Cir.) ("It also was error to assume that prison officials were justified in limiting appellant's free exercise [of religious] rights because Young was in disciplinary confinement."), *cert. denied*, 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989); *see also, e.g., Alston v. DeBruyn*, 13 F.3d 1036, 1040 (7th Cir.1994) ("the [district] court's assumption that the defendants were justified in restricting Alston's religious freedom simply because he was in administrative segregation was improper.") (citing *Young* ); *Beck v. Lynaugh*, 842 F.2d 759 (5th Cir.1988) (agreeing with Second Circuit's *Mawhinney* opinion that not all segregated prisoners can be excluded from religious services).

*Mawhinney* clearly stated the law in the Second Circuit prior to defendants' denying Salahuddin access to congregate religious services. Judge Jones confirmed this in her prior decision in this case denying defendants' earlier (second) summary judgment motion. Defendants therefore cannot claim qualified immunity.

### A. Sanctions Pursuant to Rule 11 and/or 28 U.S.C. § 1927

■ The Court cannot fathom how defense counsel, an Assistant Attorney General submitted the brief that he did. Defense counsel argued that the law regarding keeplocked prisoner's access to congregate religious services was unclear in 1985 (Defs.' Br. at 17–18), without citing Judge Jones' contrary opinion earlier in this case or the Second Circuit's *Mawhinney* decision.

Even assuming that defense counsel somehow did not find Judge Jones' decision in his file, his Shepardization of the Second Circuit's *Salahuddin* decision would have uncov-

ered it.[16] But even without Judge Jones' opinion, the Court cannot fathom how defense counsel could ·find (and cite)· *LaReau* and *Smith,* but ·not *Mawhinney* and *Leon.* The Court notes that *Mawhinney* and/or *Leon* would have been uncovered by any of the following: Shepardization of *LaReau,* a keynote search based on keynotes gleaned from the Second Circuit's *Salahuddin* opinion, or any ·word search the Court can conceive that results in finding *LaReau* and *Smith.* Moreover, defense counsel ·did find *Mawhinney*—he cited it in a different section of his brief for the proposition that "[i]n general, a prisoner has a right to engage in religious practices while incarcerated. *See . . . Mawhinney . . . .* " (Defs.' Br. at 8.) Defense counsel, however, did not cite *Mawhinney* in the qualified immunity section of his brief. (*See* Defs.' Br. at 14–15.)

Defense counsel is to show cause, by March 25, 1998, by affidavit and memorandum of law, why Rule 11 sanctions and/or sanctions pursuant to 28 U.S.C. § 1927 should not be imposed on him personally and/or the Attorney General's Office, for his failure to cite *Mawhinney* or Judge Jones' prior decision in this very case which lays out the relevant law and cites *Mawhinney,* as well as for his explanation of *Smith* which became misleading in the absence of *Mawhinney.* Defense counsel's papers must include an affidavit that they have been reviewed and are approved by a senior supervisor at the Attorney General's Office.[17]

---

**16.** Curiously, however, plaintiff Salahuddin did not cite to Judge Jones' decision in his papers.

**17.** This is not the first time ·that the Court has had concerns about defense counsel's filings in this case. On October 21, 1997, after reviewing patently frivolous objections by defense counsel to plaintiff's interrogatory requests, the Court requested an explanatory affidavit from defense counsel's supervisor. (*See* 10/21/97 Tr. at 14–15, 18.) Defense counsel's supervisor, Christine Morrison, responded:

> 5. I have read the transcript of the conference held on October 21, 1997, as well as plaintiff's interrogatories and defendants' responses to the interrogatories at issue. *I am in complete agreement with the Court. The objections to plaintiff's interrogatories were improper and only protracted the litigation in this case.*

## IV. *PERSONAL INVOLVEMENT*

■ "In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of respondeat superior does not apply to § 1983 actions." *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) (citing *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)); *accord, e.g., Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Watson· v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.); *Wright v. Nunez,* 950 F.Supp. 610, 611 (S.D.N.Y.1997) (Martin, D.J. & Peck, M.J.); *McCray v. Kralik,* 96 Civ. 3891, 1996 WL 378273 at *3 (S.D.N.Y. July 1, 1996) (Peck, M.J.).

■ "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy of custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrong-

---

> · 6. I regret that I did not review the responses prepared by [defense counsel] before they were served on the plaintiff. In my experience, these interrogatory responses are not typical of [defense counsel's] work which usu- , ally reflects preparation and care. In any case, the responses are not consistent with the standards set by this office. I intend to closely review [defense counsel's] work in the future and have closely monitored [defense counsel's] efforts this week to resubmit his responses.
>
> 7. On behalf of this office, I apologize to the Court and to Mr. Salahuddin for the delay ·and inconvenience caused by these responses.

(Morrison Aff. ¶¶ 5–7, emphasis added.) The requested Rule 11 affidavit(s) should explain what supervision of defense counsel, if any, occurred in connection with the filing of the current summary judgment motion.

ful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d at 873; *see also, e.g., Watson v. McGinnis,* 964 F.Supp. at 130; *Wright v. Nunez,* 950 F.Supp. at 611; *McCray v. Kralik,* 1996 WL 378273 at *3; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1109.

Salahuddin has offered evidence that sufficiently demonstrates the personal involvement of Defendants Edwards, Kuhlman, Mitchell and McCray.[18] Salahuddin has offered the minutes from a series of Sullivan Executive Team Meetings, attended by these four defendants, at which the lack of Muslim congregate religious services and the unavailability of a Muslim chaplain, known as an Iman, was discussed, as well as the status of congregate religious services for other religions. (Salahuddin Aff. Exs. D, E, F, G, H, I, J, K & N; *see also* Salahuddin Dep. at 69–74.) Also, an inter-office memorandum from defendant Edwards suggests that congregate services may have been offered to keeplocked inmates of religions other than Muslim. (Salahuddin Aff. Ex. C; *see also id.* Exs. L, O.) Additional evidence has been offered as to the personal involvement of defendants Edwards and Kuhlman: Salahuddin, at his deposition, detailed complaints and requests to attend congregate Muslim religious services made by him personally to Edwards and Kuhlman, as well as their failure to remedy the situation. (Salahuddin Dep. at 31–34, 59–61, 69–73.) A jury could find that these defendants' actions were insufficient to satisfy constitutional requirements because: (1) Muslim inmates should not have been moved to Sullivan until an Iman had been hired or other arrangements made for congregate Muslim religious services;[19] (2) Salahuddin offered evidence that Muslim Imans can be selected to lead congregate services for the Muslim prison populace by the Muslim prisoners from among their ranks (Salahuddin Dep. at 19–23, 33–34), making a professional Iman unnecessary for Muslim congregate services; (3) keeplocked inmates were allowed to attend congregate religious services of religions other than Muslim; and/or (4) Salahuddin and other keeplocked inmates should have been allowed to attend congregate religious services at Sullivan in August 1995 because there were no valid security or other reasons to deny such services.

On the other hand, Salahuddin has not demonstrated defendant Coughlin's personal involvement. Salahuddin's deposition testimony makes clear that Coughlin's only alleged role was in a supervisory capacity as head of DOCS. Salahuddin testified as follows:

Q. . . . . [H]ow did defendant Coughlin deprive you of your rights?

A. Well, one, I would say because discovery is not completed, I can't precisely say, but I would say as the head official of the Department of Correctional Services, he's responsible of all actions of his subordinates.

Q. It's more as far as his supervisory capacity is concerned?

A. I would say—I would say when he—you know, his subordinates made the decision to make me move there, move me from Auburn to Sullivan and allegedly knowing that the facility was incomplete and couldn't—wouldn't hold any programs whatsoever, that he should have known that I would be deprived or every inmate was going to be deprived of the freedom of speech, pardon me, freedom of religion.

Q. It's really in his supervisory capacity then that you believe he violated your rights?

A. Well, I believe pursuant to all the statutes and regulations that governs the

---

18. The Court assumes that Salahuddin's defendant "McCrea" is actually Frank McCray, Sullivan's Program Coordinator, who is mentioned in several documents. (*See* Salahuddin Aff. Exs. D, E, F, G, H, I, J, K & N.)

19. While it is undisputed that defendants were not personally involved in selecting plaintiff Salahuddin for transfer to Sullivan, and thus cannot have liability on that ground, they were responsible for making arrangements for congregate religious services for inmates at Sullivan, and could be found liable for failing to perform that duty, leading to deprivation of plaintiff's constitutional religious rights.

Department of Correctional Services that he should have known or advised his subordinates that they had a right or that I had a right to attend religious services based on the laws, based on the statutes, the directives from the Department of Correctional Services that I should have been given the right to attend religious services.

(Salahuddin Dep. at 68–69.) As discussed above, supervisory liability is impermissible under § 1983 without some form of personal involvement.

Salahuddin points to a letter from the Sullivan construction contractors to Coughlin as evidence of Coughlin's personal involvement. (Salahuddin Br. at 6, citing Salahuddin Aff. Ex. CC.) However, this letter only suggests that Coughlin knew that keeplocked inmates were transferred to Sullivan before Sullivan was fully functional. It does not suggest that Coughlin had any knowledge of the methods used to select these inmates, or that he even knew that congregate religious services were unavailable at this facility. Defendant Coughlin is entitled to summary judgment for lack of personal involvement in the alleged deprivation of Salahuddin's Constitutional rights.[20]

## CONCLUSION

For the reasons set forth above, I recommend that defendants' summary judgment motion be denied, except that it be granted only as to defendant Coughlin for lack of personal involvement.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, Room 750 and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Rakoff. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## SCHEDULING ORDER

The joint pretrial order ("PTO"), in conformance with Judge Rakoff's rules and instructions, is due by April 15, 1998. To assure that the joint PTO is ready for submission by that date, the parties are to exchange drafts of their respective portions of the PTO, as follows: March 20, 1998 defendants, April 3, 1998 plaintiff, April 10, 1998 defendants. The opposing party is to notify the Court if he has not received a draft on the above-scheduled dates. Defense counsel is responsible for filing the final joint PTO with the Court by April 15, 1998 (with courtesy copies to my chambers, and Judge Rakoff's chambers). The Court notes that the filing of objections to this Report and Recommendation will not serve to postpone the filing of the PTO.

March 11, 1998.

---

**20.** Salahuddin acknowledged at his deposition that defendant "Lewis" does not exist. (Salahuddin Dep. at 74–75.) Nor has such a defendant been served.